# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERNESTO G. LIRA,
          *Plaintiff-Appellant,*

v.

LT. HERRERA; M. PILAND; J.
BRIDDLE; A. SCRIBNER; J. STOKES;
B. HEAPS, K. CRUSE; BRUCE;
FIELDER; M. NIMROD; K. MANN; D.
BEST; C. PATTEN; D. BRADBURY;
K.C. BOLLES; EDWARD ALAMEIDA;
Asst. Warden BUSSER,
                *Defendants-Appellees.*

No. 02-16325

D.C. No.
CV-00-00905-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
November 2, 2004—San Francisco, California

Filed November 1, 2005

Before: Stephen Reinhardt, David R. Thompson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

14919

## COUNSEL

Douglas A. Winthrop and Warren Metlitzky, Howard Rice Nemerovski Canady Falk & Rabin, San Francisco, California, for the plaintiff-appellant.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Frances T. Grunder, Senior Assistant Attorney General, Rochelle C. Holzmann, Supervising Deputy Attorney General, Barbara C. Spiegel, Supervising Deputy Attorney General, and Jonathan L. Wolff, Supervising Deputy Attorney General, San Francisco, California, for the defendants-appellees.

## OPINION

BERZON, Circuit Judge:

Ernesto Lira was for several years placed in administrative segregation, and later in a Special Housing Unit (SHU), because prison officials determined that he was affiliated with a prison gang and posed a threat to prison safety. He filed this suit under 42 U.S.C. § 1983, protesting that his treatment at California's Deuel Vocational Institute and Pelican Bay Prison violated due process. The district court granted defendants' joint motion for summary judgment on the ground that the sole remaining cause of action encompassed both a fully exhausted claim and some unexhausted claims. We must decide whether the district court properly construed the Prison Litigation Reform Act's ("PLRA") exhaustion requirement, 42 U.S.C. § 1997e(a).

## FACTUAL BACKGROUND

Lira is a former inmate of the California corrections system. He entered the Deuel Vocational Institute (DVI) in 1995, where he was immediately "validated" as an associate of the Northern Structure gang. "Validation" as a prison gang member is a designation reserved for prison gang members believed to pose a threat to prison safety. For Lira, the consequence of validation was placement in administrative segregation[1] at DVI and then in the Special Housing Unit ("SHU")[2]

---

[1] The Department of Corrections' internal regulations explain that administrative segregation, or "ad-seg," "provides secure housing upon the initial period of separation from the general population for any reason until a classification committee has determined whether the inmate's placement should be in a specialized housing unit or in the general population." Department of Operations Manual ("DOM") § 62050.10.1, *available at* http://www.corr.ca.gov/RegulationsPolicies/PDF/DOM/00_dept_ops_maunal.pdf (last visited Sept. 22, 2005). Criteria for placement in ad-seg are "limited to those cases where reasons exist that the inmate's continued presence in the general population would do any of the following:

of Pelican Bay State Prison. At both institutions, Lira was locked in his cell for twenty-two and one half hours each day.

On January 4, 1996, Lira appeared before DVI's Institution Classification Committee (ICC) for his initial review of the validation designation.[3] *See* DOM § 62050.10.6. He was told that there was "some evidence" of his membership in the Northern Structure gang, but not what the evidence was. Lira again appeared before the ICC at monthly reviews in February and March 1996 but was given no further information.

After court appearances in the spring of 1996 Lira was returned to DVI where he was placed, again, in administrative segregation. On June 27, 1996, Lira attended another ICC

---

[e]ndanger the security of the institution; [j]eoparidize the integrity of a serious misconduct or criminal investigation; [e]ndanger the safety of the inmate or others." DOM § 62050.10.3.

[2]"SHUs provide secure housing for inmates whose conduct endangers the safety of others or the security of the institution." DOM § 62050.13. Internal regulations require that an inmate

> be placed in SHU if: [t]he inmate has requested segregation for their own protection and the need can be substantiated by appropriate staff; [t]he inmate is newly arrived at the institution and more information is needed to determine whether the inmate may be incompatible with any element of the general population . . . ; [t]he inmate has been found guilty of a disciplinary offense sufficiently serious to warrant confinement for a fixed term in segregation, and the term is fixed in conformance with the SHU Term Assessment Chart; [t]he inmate's continued presence in general population would severely endanger lives of inmates or staff, the security of the institution or the integrity of an investigation into suspected criminal activity.

*Id*. DOM § 62050.13.2.

[3]The Department's internal regulations require initial review of ad-seg placement "within ten days of receipt in the unit." If an inmate is retained in ad-seg, the "ICC shall review the inmate at least every 30 days thereafter until the inmate is released from temporary segregation." DOM § 62050.10.6.

review of his placement, but, once more, was given no details concerning the evidence substantiating his validation as a Northern Structure gang member.

At that time, it appears, the Department of Corrections' Special Services Unit (SSU), did not have Lira's "C-file," the central file containing all documentation concerning an inmate. The C-file contained the information that formed the basis for Lira's initial administrative segregation placement. The SSU received the C-file after Lira's June 1996 review but before his July 1996 review.

On July 29, 1996, after approximately seven months of placement in administrative segregation, Lira resorted to the Department's three-level inmate grievance process to complain about his validation. A grievance is usually first considered by a prison's Appeals Coordinator and involves an interview with the inmate. *See* Cal. Code Regs. tit. 15, § 3084.3(a), (b). The institution's head or regional parole administrator reviews the grievance at the second level of review. *See id.* § 3084.5(c), (e)(1). Finally, a designee of the Director of the Department of Corrections hears the third formal appeal. *See id.* § 3084.5(e)(2).

Lira wrote a description of his problem on his grievance form, explaining that he had never received the evidence that constituted his validation as a Northern Structure member and arguing that he therefore could not prepare for the reviews of his placement in administrative segregation. He also represented that he had spoken with a Merced County Sheriff's Office correctional officer who had provided the prison with information about his status as a Northern Structure associate. According to Lira, the officer told him that he had reported only that Lira had been housed with the Northern Structure inmates during a prior jail sentence, not that Lira himself was in the Northern Structure gang. Lira also complained that he had made a request for information concerning his validation from the ICC but received no response. In the section labeled

"Action Requested," he stated: "#1 To be released from ad/ seg and returned to [general population], #2 remove all these 128-B from my C.D.C. file. 3. Be given a program, and left alone to do my time. I'm too old to play games, never have."

Lira received a first level response on August 22, 1996. His appeal was denied in light of the "staff belie[f] that [he] was an associate member of th[e] prison gang." Lira was told, however, that an investigation of his gang status was underway, because the July 2, 1993 document used to validate his membership in the Northern Structure gang "[did] not meet current departmental validation requirements."

Lira appealed the decision to the second level review on September 2, 1996, arguing that he was dissatisfied with the first level review because, as his first level interviewer had told him, the 1993 document used to justify his administrative segregation placement was "all wrong." Following Lira's transfer to the Pelican Bay State Prison, a second level response, denying relief, was issued, on September 27, 1996. While the second level review was pending, the SSU revalidated Lira as a gang associate, applying the then-current regulations. By the time of the second level response, the report used to validate Lira as a member of the Northern Structure gang had been reconsidered under the new regulations. Lira's second level appeal was denied on the basis that the revalidation was proper.

Lira received a copy of his C-file on October 18, 1996. He learned that his validation stemmed from information provided by a DVI correctional counselor in 1992 and 1993. The next day, Lira appealed the second level reviewer's decision on his July 29, 1996 grievance to the third level, that of the Director of the Department of Corrections. He explained his dissatisfaction as follows:

> "First of all," to this date, and many request forms later, I have not received the suppose 128 B-2 dated

9-4-96 or any other documentation relied upon to validate me as something I'm not. I am now here at [Pelican Bay State Prison] with an indeterminate SHU. These chronos inclosed is all that I have received. Directors rule 3000 defines "gangs" means to engage or have engaged on behalf of an organization in unlawful acts. I have no serious "115."[4] I am not satisfied and request a director's review.

The Director issued a denial of Lira's final appeal on January 24, 1997. The response memorandum summarized the issue as follows: "Whether or not the institution's denial of appellant's request to release him to the general population and remove all gang related information from his Central File (C-File) is appropriate." The Director level response indicated that Lira's continued detention in administrative segregation was appropriate because of the recent revalidation. Citing the relevant regulations, the memorandum concluded that "[t]he documentation and arguments presented are persuasive that the appellant fails to provide convincing proof that he was inappropriately removed from the general population."

Lira continued to be dissatisfied with his placement in administrative segregation. He sought and received confirmation from Merced County Sheriff's Department Correctional Officer Romero that the Merced County Sheriff's Department "cannot find any gang validation on Ernesto Lira in Merced County jail." Lira proceeded to file a second grievance on April 4, 1998, requesting "(A) immediate release from indeterminate SHU status; (B) that R. Romero's letter dated 3-8-1998 be entered into my C-File (in re: confidential section/gang status); and (C) that the 128-B dated 5-10-93 in regards to what IGI Covello claims C.O. Romero told him be expunged, dropped, or reinvestigated for independent reliability."

---

[4]CDC Form 115 is used to report prisoners' rules violations. *See* DOM § 61020.7.

The first level response memorandum to this grievance, dated August 6, 1998, explained that Lira's appeal was denied because the three items used to validate Lira's status as a Northern Structure gang member "[met] the criteria for use in the validation process." The reviewer contacted Officer R. Romero to verify that the letter was authentic. The memorandum explained that the letter had no bearing on Lira's validation within the prison, as the letter "merely refer[red] to Merced County Sheriff's Department consideration for validation." The response also denied Lira's request to have the letter added to his C-File.

Lira's second level appeal was also denied, on September 21, 1998. The response memorandum agreed with the first level reviewer's conclusions that the documents used to validate Lira as a member of the Northern Structure gang were adequate. The second level reviewer also rejected Lira's argument that "the information utilized was not proven to be first-hand or hearsay and, therefore, d[id] not meet standards," and stated that "[a]ll nonconfidential information utilized by the SSU and [Institutional Gang Investigator] during the validation process was available and disclosed to the inmate prior to the inmate's classification appearances." Lira did not pursue this second grievance further.

He did, however, file a third grievance, on November 3, 1999, protesting, once again, his indeterminate administrative segregation placement. Under "Action Requested," Lira wrote: "(1) to immediately be released from this unjust indeterminate SHU placement. (2) to be given my day for day time credits good time work time. Under Pen. Code 2933 - Title 15 sec. 3043(c)." It appears that for this grievance Lira completed only the first level of review, which was denied.

In March 2000, Lira, representing himself, filed suit in district court under 42 U.S.C. § 1983, alleging (1) that his validation as a Northern Structure gang member violated due process; (2) that the defendants exhibited deliberate indiffer-

ence to his safety, in violation of the Eighth Amendment, by randomly assigning him a cellmate with no consideration of inmate compatibility; and (3) that he was denied his constitutional right of access to the courts. Ruling on a defense motion to dismiss, the district court dismissed the second and third claims for failure to state a claim.[5] Approximately one year later, ruling on a defense motion for summary judgment on the sole remaining cause of action, the court reasoned that because Lira failed to appeal his 1998 and 1999 grievances to the third level, he had not met the exhaustion requirement of 42 U.S.C. § 1997e(a). The court dismissed the entire case without prejudice.

## DISCUSSION

**[1]** Generally, "exhaustion is a not a prerequisite to an action under § 1983." *Patsy v. Bd. of Regents*, 457 U.S. 496, 501 (1982). The PLRA, Pub. L. No. 104-134, § 803(d), 110 Stat. 1321-71 (1996), however, amended the Civil Rights of Institutionalized Persons Act ("CRIPA"), Pub. L. No. 96-247, 94 Stat. 349 (1980), to create an exhaustion requirement for suits brought by prisoners under 42 U.S.C. § 1983 with respect to prison conditions. The amendment added by the PLRA states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

**[2]** Lira recognizes that under § 1997e(a) only those aspects of his suit for which he completed all levels of the internal prison appeals process may go forward. Lira's objection is that the district court implemented this requirement by dismissing the entire action, without prejudice to refiling after

---

[5]The district court also denied the defendants' motion to dismiss Lira's claims as time-barred, a ruling that the defendants have not challenged before this court.

exhaustion is completed. Defendants, in contrast, urge us to affirm the dismissal of Lira's entire case, because of his asserted failure completely to exhaust all of his claims before filing.[6]

**[3]** The pivotal question is, consequently, a narrow one: Where a prisoner's complaint contains exhausted and unexhausted claims, need the district court dismiss the entire action, or may only the unexhausted claims or only the complaint be dismissed, in the last instance allowing the prisoner to seek leave to amend his complaint by excising the unexhausted claims?

As a preliminary matter, we take note of the crucial distinction between dismissing an action and dismissing a complaint. Dismissal of an entire *action* constitutes a final judgment by a district court. *See WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (holding that "a plaintiff, who has been given leave to amend, may not file a notice of appeal simply because he does not choose to file an amended complaint," as appellate review is unavailable until a district court orders dismissal of an entire action). In contrast, when a district court dismisses a complaint for failure to state a claim, granting leave to amend the defective complaint is routine. If a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 992 (9th Cir. 1999) (holding that a district court that had granted leave to amend the complaint did not abuse its discretion by dismissing entire *action* when plaintiff failed to replace a defective complaint).

---

[6]Although defendants label the rule for which they argue as one of "total exhaustion," we use the term "total exhaustion dismissal." There is no dispute that the action must be "totally exhausted" in the sense that only exhausted claims can be litigated. The dispute concerns only whether the action must be dismissed and refiled if there are unexhausted claims included.

Failure to grant leave to amend the complaint, however, "is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004). This usual scheme applies in the prisoner civil rights litigation context. *See Lopez v. Smith*, 203 F.3d 1122, 1124 (9th Cir. 2000) (en banc) (holding that, when dismissal is appropriate under the PLRA's provisions allowing a district court to dismiss an *in forma pauperis* complaint "if the court determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted," a district court retains discretion to decide whether a plaintiff may have leave to amend a complaint (quoting 28 U.S.C. § 1915(e)(2))).

The primary practical implications of requiring dismissal of the entire action, as urged by the defendants, are: (1) limitations periods can run while cases are pending in federal court, possibly precluding refiling claims that were both exhausted and timely filed in court in the first instance; (2) a new filing fee may have to be paid; and (3) under the PLRA "strike" procedure, 28 U.S.C. § 1915(g), a prisoner who files three cases that are ultimately dismissed may not be able to proceed *in forma pauperis* in future cases.[7]

We are not the first circuit to consider this issue. The Sec-

---

[7]" 'Strikes' are prior cases or appeals, brought while the plaintiff was a prisoner, which were dismissed 'on the ground that [they were] frivolous, malicious, or fail[ ] to state a claim . . . . Pursuant to § 1915(g), a prisoner with three strikes or more cannot proceed" *in forma pauperis*. *Andrews v. King*, 398 F.3d 1113, 1116 n.1 (9th Cir. 2005) (alterations in original). "[P]rior dismissals would qualify as strikes only if, after reviewing the orders dismissing those actions and other relevant information, the district court determined that they had been dismissed because they were frivolous, malicious or failed to state a claim." *Id*. at 1121. We have not yet decided whether a dismissed lawsuit can be "frivolous, malicious, or fails to state a claim," because of an exhaustion defect and have no occasion to do so here.

ond, Sixth, Eighth, and Tenth Circuits have all considered the same question, with conflicting results. *Compare Bey v. Johnson*, 407 F.3d 801, 809 (6th Cir. 2005) (holding that § 1997e(a) mandates dismissal of an entire action when a prisoner files a mixed complaint), *and Ross v. County of Bernalillo*, 365 F.3d 1181, 1182 (10th Cir. 2004) (holding that § 1997e(a) creates a total exhaustion-dismissal rule), *with Ortiz v. McBride*, 380 F.3d 649, 651 (2d Cir. 2004) (holding that § 1997e(a) is not a total exhaustion-dismissal rule), *and Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2003) (holding that § 1997e(a) requires dismissal of only the defective, mixed complaint rather than the entire action). After reviewing relevant principles announced by the Supreme Court, the statutory language, and underlying policy considerations, we agree, with some caveats, that the Second Circuit's approach is appropriate, *see Ortiz*, 380 F.3d at 651, and hold that the "total exhaustion-dismissal" rule urged by defendants is not mandated by § 1997e(a).

## I.  The PLRA's Exhaustion Requirement

Section 1997e(a) specifies that "[n]o action shall be brought . . . until . . . available remedies are exhausted." 42 U.S.C. § 1997e(a). Under this provision, no claim may be pursued in court unless the prisoner has given the prison authorities an opportunity to consider providing some relief regarding the facts underlying the grievance. *See Booth v. Churner*, 532 U.S. 731, 736 (2001). That requirement necessarily applies to all claims alleged, as both parties recognize. Also, a district court must dismiss a case without prejudice "when there is no *presuit* exhaustion," even if there is exhaustion while suit is pending. *McKinney v. Carey*, 311 F.3d 1198, 1200 (9th Cir. 2002) (per curiam) (emphasis added).

The open question is whether a suit must be dismissed when there is presuit exhaustion of one or more of the claims contained in the complaint, or whether a different procedure is available to assure that only exhausted claims go forward.

The defendants argue that the statutory text must be read to require dismissal without prejudice of cases in which there are "mixed" complaints, no matter the consequence for the prisoner's ability to pursue already exhausted claims. For several reasons, we do not agree.

The text of § 1997e(a) specifies a rule regarding the *instigation* of suit — that "[n]o action shall be brought" unless there has been exhaustion. The statute does not prescribe the proper response by the district court if that requirement is not met. We have held that the phrase "[n]o action *shall be brought*" does not mean that we always must dismiss an action that does not comply with § 1997e(a). In *Wyatt v. Terhune*, 315 F.3d 1108 (9th Cir. 2003), we held that § 1997e(a) is not a jurisdictional requirement that the plaintiff must plead and establish. Instead § 1997e(a) establishes an affirmative defense, waived if the defendant does not raise it. *Id.* at 1117-18 & n.9. *Wyatt* indicates that § 1997e(a)'s requirement regarding commencement of the action does not foreordain dismissal if not complied with.

Defendants' argument for a total exhaustion-dismissal rule must therefore rest on Congress's use of the word "action" in § 1997e(a). The argument is that where dismissal *is* appropriate, it is the entire action, not a part of it, that must be dismissed.

The term "action" is used throughout the statute. *See, e.g.*, § 1997e(c), (e). CRIPA, as amended by the PLRA, "like every Act of Congress, should not be read as a series of unrelated and isolated provisions." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). To "adhere[ ] to the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning,' " *id.* (quoting *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)), we consider similar uses of the term "action" in the statute, in particular § 1997e(c) and (e).

Unlike § 1997e(a), § 1997e(c) specifically covers "dismissals." The latter section provides:

Dismissal.

(1) The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

(2) In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.

42 U.S.C. § 1997e(c).

**[4]** In three respects, § 1997e(c) indicates that district courts need not dismiss an entire action because there is an unexhausted claim:

**[5]** *First*, in § 1997e(c), Congress ordered dismissal of *certain* defective suits and claims — those that are "frivolous, malicious, fail[ ] to state a claim upon which relief can be granted, or seek[ ] monetary relief from a defendant who is immune from such relief," but did not specify that mixed actions must be dismissed. *See Ortiz*, 380 F.3d at 657 ("Section 1997e(c) . . . the place where we would expect to find guidance as to whether dismissal of 'mixed' actions is required[, ] is silent on the issue."). This omission suggests

that no special rule regarding the treatment of nonviable causes of action was intended.

**[6]** *Second*, the reference to dismissal of a "claim" in § 1997e(c)(2) if there has been a failure to exhaust, juxtaposed to the reference to dismissal of an "action" in § 1997e(c)(1), indicates that claims that have not been exhausted can be treated independently, for dismissal purposes, from the action as a whole. There would be little point in providing for the dismissal of some nonexhausted claims on the merits if the remainder of the action would then have to be dismissed, although exhausted, because of the failure to exhaust the dismissed claims.[8]

**[7]** *Third*, as Judge Clay persuasively explained in his dissent in *Bey*, interpreting the word "action" in § 1997e(a) and (c)(1) to indicate that an exhaustion defect in *any* claim infects the suit as a whole would "render[ ] subsection (c)(2) superfluous." *Bey*, 407 F.3d at 811 (Clay, J., concurring in part and dissenting in part). If § 1997e(a) demands a total exhaustion-dismissal rule because it uses the word "action," then § 1997e(c)(1), because it uses the word "action," must also require dismissal of the entire case if *any* claim is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." Yet, § 1997e(c)(1) must apply only when *all* the claims meet the statutory standard for summary dismissal on the merits, not when only some of them do. Otherwise, § 1997e(c)(2), contemplating the dismissal of individual frivolous "claims," would be unnecessary. The inclusion of a single frivolous claim would contaminate the entire action, mandating dismissal under § 1997e(c)(1).[9]

---

[8]We note that the district court in this case followed this procedure, dismissing Lira's court access and Eighth Amendment claims from the complaint on the merits, before any exhaustion defense was considered.

[9]We note as well that, even read independently, § 1997e(c)(1) mandates dismissal only if the action "fails to state *a* claim upon which relief can be granted." § 1997e(c)(1) (emphasis added). In other words, *one* viable claim is sufficient to avoid dismissal of the action.

**[8]** To read the word "action" as used in § 1997e(c)(1) as precluding dismissal of individual defective claims would therefore clash with the "basic rule of [statutory] construction" requiring that we avoid interpreting a section of a statute in such a way that would make other sections become redundant. *Padash v. INS*, 358 F.3d 1161, 1170-71 (9th Cir. 2004). Consequently, we cannot attribute to the use of the term "action" in the PLRA the understanding that the entire case must be treated for dismissal purposes as a unitary whole if it contains both valid and invalid causes of action.

Another statutory provision reinforces this conclusion. Section 1997e(e) provides: "No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). A case under § 1997e(e) analogous to this one would be a "mixed" complaint alleging one claim for mental and emotional suffering not stemming from an underlying physical injury and a second claim not alleging mental or emotional injury, or alleging a claim for mental or emotional injury stemming from a physical injury. Under defendants' unitary approach to the term "action," dismissal of the entire case would be warranted.

In *Robinson v. Page*, 170 F.3d 747 (7th Cir. 1999), the Seventh Circuit rejected just that approach. Writing for the court, Judge Posner concluded that dismissal of the defective claim alone was "the natural reading of the statute, and there is no legislative history or other source of meaning to contradict the natural reading." *Id*. at 748. *Robinson* observed that,

> [t]o go further and dismiss the entire suit because it had one bad claim would be not only gratuitous, but also contrary to the fundamental procedural norm that when a complaint has both good and bad claims . . . only the bad claims are dismissed; the complaint as a whole is not. If Congress meant to depart from

> this norm, we would expect some indication of that, and we find none.

*Id.* at 748-49. We agree with this reasoning and find it fully applicable to § 1997e(a).

In sum, the use of the term "action" elsewhere in the statute does not support interpreting § 1997e(a) as dictating a total exhaustion-dismissal rule. To the contrary, while "action" in the PLRA refers to the case as a whole, the statute consistently uses the term in a manner that contemplates dismissing the *entire* action only if the *entire* action fails to meet statutory standards. When some claims are valid and others are not, the usual procedural norm — that when a complaint has both good and bad claims, only the bad claims are "dismissed," *id.*, — prevails.

We regard these textual and structural considerations as dispositive. For that reason, any analogy to habeas corpus is unpersuasive. *Contra Ross*, 365 F.3d at 1189-90.

In *Rose v. Lundy*, 455 U.S. 509 (1982), the Supreme Court mandated a rule requiring total exhaustion-dismissal for "mixed" habeas corpus petitions in many circumstances.[10] That decision, however, depended exclusively on policy considerations, because the applicable statute was not informative. *Id.* at 516-17 (analyzing "the policies underlying the

---

[10]*Rose*, however, does not necessarily require dismissal of the action, as opposed to the petition. *See Rose*, 455 U.S. at 520 (plurality) (noting that a petitioner "can always amend the petition to delete the unexhausted claims"). Also, as modified by the recent decision in *Rhines v. Weber*, 125 S. Ct. 1528 (2005), the *Rose* rule permits mixed petitions to be stayed rather than dismissed in the "limited circumstances" where a district court "determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id.* at 1535; *see also Jackson v. Roe*, ___ F.3d ___, No. 02-56210, 2005 WL 2319679 (9th Cir. Sept. 23, 2005). Thus, the habeas corpus analogy does not support the inflexible total exhaustion-dismissal rule for which defendants argue.

statutory provision to determine its proper scope" when the text found to be ambiguous). Where, in contrast, the statutory language and structure answer an interpretation question, resorting to judicial evaluation of policy considerations is inappropriate. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

Even if we were to take policy considerations into account, those considerations support our rejection of a total exhaustion-dismissal rule. As noted above, in *McKinney*, we concluded that § 1997e(a) demands dismissal of cases in which there was no "presuit exhaustion," 311 F.3d at 1200, because a contrary result would mean that none of the benefits of the exhaustion requirement would be realized. This reading of the statute was appropriate despite the potential "expenditure of additional resources on the part of the parties and the court [because] it seem[ed] apparent that Congress has made a policy judgment that this concern is outweighed by the advantages of requiring exhaustion prior to the filing of suit." *Id.*

Such balancing yields a different result in this case, because reading § 1997e(a) as a total exhaustion-dismissal rule would not advance the primary policy goals of the PLRA. As identified by the Supreme Court, those goals are to "reduce the quantity and improve the quality of prisoner suits," by filtering out frivolous claims, satisfying some grievances, and developing an administrative record for use in cases that do go forward. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

To dismiss an entire case that includes exhausted claims would do little to discourage piecemeal litigation. A prisoner who has filed an improper mixed complaint could often refile, including this time only the properly exhausted claims, while exhausting the remaining claims and filing another suit later. *See Bey*, 407 F.3d at 811-12 (Clay, J., concurring in part and dissenting in part); *Ortiz*, 380 F.3d at 658. Unlike for habeas corpus cases, *see* 28 U.S.C. § 2244(b), there is no preclusion

on filing more than one PLRA suit. Also, PLRA causes of action joined in a single action may concern entirely independent underlying factual circumstances, so that ordinary rules of claim preclusion would not apply later. *See Headwaters, Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051-52 (9th Cir. 2005). The result could be a new suit, essentially identical to the one dismissed, as the unexhausted claims would have dropped out early anyway. Such a requirement would promote the precise inefficiency the PLRA was designed to avoid — requiring courts to docket, assign and process two cases where one would do.[11]

A total exhaustion-dismissal rule makes little practical sense in the context of § 1983 prison condition actions for another reason as well. The causes of action joined together in a single suit may have little to do with each other, temporally or substantively. In this case, for example, Lira included claims concerning asserted danger from other prisoners, claims concerning law library access, and claims concerning his assignment to administrative segregation and SHU. On defendants' submission, any one of these causes of action would have had to be dismissed even if fully exhausted, if another was not exhausted. Yet, exhausting one of these causes of action would not help to satisfy the plaintiff, weed out frivolous complaints, or develop an administrative record with respect to the other two, entirely separate matters. That is why, presumably, the district court was comfortable deciding the merits of two of the unexhausted claims before even considering the adequacy of exhaustion as to the third. *Cf. Ortiz*, 380 F.3d at 653 (disposing of plaintiff's supervisory liability claim before considering exhaustion issue with respect to underlying Eighth Amendment allegation). Moreover, if Lira had filed yet another grievance with regard to an allegedly unconstitutional condition of confinement, he could

---

[11]Moreover, the PLRA's "three strikes" rule, 28 U.S.C. § 1915(g), already discourages multiple lawsuits. *See Bey*, 407 F.3d at 812 (Clay, J., concurring in part and dissenting in part).

have filed a separate action regardless of the fate of this suit. Which claims are joined in a given PLRA lawsuit, in other words, is largely up to the plaintiff. As a result, the goal of avoiding piecemeal litigation is far less achievable than in the habeas context, where a single conviction is at issue and severe restrictions on second and successive petitions ordinarily require that all challenges to that conviction be joined in a single petition. *See* § 2244(b).

It is true, of course, as noted at the outset, that dismissal of the action for lack of total exhaustion could result in an inability to pursue the *exhausted* claim, because of a statute of limitations barrier or inability to pay a second filing fee. But imposition of such barriers with regard to properly brought claims runs the risk of precluding meritorious, fully exhausted claims so as to discourage the filing of nonmeritorious claims. Any disincentive would be more properly directed at discouraging the later refiling of the unexhausted claims — and, indeed, the "three strikes" provision to some degree serves that purpose, by requiring the payment of a filing fee if a prisoner repeatedly files frivolous suits.

**[9]** In sum, with no danger that a prisoner can press forward in this suit with unexhausted claims, *see McKinney*, 311 F.3d at 1200, and thereby, in the words of the district court, use the exhaustion of one claim as a "hook to have many unexhausted claims considered in a federal civil rights action," adoption of a total exhaustion-dismissal rule would do nothing to advance Congress's policy goals. We conclude that the applicable policy considerations further buttress our determination that the text and structure of the PLRA demonstrates that Congress intended no special dismissal rules for § 1983 prisoner suits in addition to those spelled out in § 1997e(c).

## II.   Proper Disposition of Mixed Complaints

Having rejected defendants' suggestion that we adopt a total exhaustion-dismissal rule, we are left with a more dis-

crete question: how *should* district courts proceed in cases in which the plaintiff has filed complaints with both exhausted and unexhausted claims?

**[10]** In light of § 1997e(a)'s text and the policy rationales surrounding its adoption and application according to Ninth Circuit and Supreme Court law, we believe that a dual rule is appropriate. We hold that the proper treatment of a mixed complaint should depend on the relatedness of the claims contained within.

**[11]** When a plaintiff has filed a "mixed" complaint and wishes to proceed with only the exhausted claims, a district court should simply dismiss the unexhausted claims when the unexhausted claims are not intertwined with the properly exhausted claims. This is likely to be the ordinary case in PLRA suits, where plaintiffs often raise several unrelated claims in a single lawsuit. *See Ortiz*, 380 F.3d at 661 (noting that § 1983 suits "routinely seek to address more than one grievance — sometimes a laundry list of grievances — relating to different events or circumstances"). Here, for example, Lira raised some issues that had nothing to do with his gang status or administrative segregation confinement. The district court addressed those issues on the merits and resolved them, considering the total exhaustion-dismissal rule only thereafter.

We note the contrast in this regard to cases in the habeas context. While habeas petitions may contain various claims that rest on different constitutional provisions, they all revolve around one incident: the defendant's conviction. *See Mayle v. Felix*, 125 S. Ct. 2562, 2570 (2005) (holding that a claim arising out of the same trial or sentence is insufficient to meet Rule 15's same "conduct, transaction, or occurrence" test because "federal habeas claims, by their very nature, challenge the constitutionality of a conviction or sentence"). This fact was of particular concern to the Supreme Court when it adopted a total exhaustion-dismissal rule for mixed habeas petitions in *Rose*. The Court noted that "[r]equiring dismissal

of petitions containing both exhausted and unexhausted claims will relieve the district courts of the difficult if not impossible task of deciding when claims are related, and will reduce the temptation to consider unexhausted claims." *Rose*, 455 U.S. at 519. This consideration is inapplicable when a prisoner's PLRA complaint contains markedly different claims. In that instance, a district court will be able to determine with relative ease which claims have been exhausted and which still need to be presented to prison officials. Under such circumstances, there will not often be any danger that an unexhausted claim will be implicitly decided while addressing an exhausted one.

On the other hand, when a plaintiff's "mixed" complaint includes exhausted and unexhausted claims that *are* closely related and difficult to untangle, dismissal of the defective complaint with leave to amend to allege only fully exhausted claims, is the proper approach. This is the procedure prescribed for mixed habeas petitions by the Supreme Court in *Rose*. Although *Rose* adopted a total exhaustion-dismissal rule, the Supreme Court, as noted, made clear that dismissal of an entire *action* is not always necessary. Instead, a petitioner should be allowed to "amend the petition to delete unexhausted claims, rather than returning to state court to exhaust all of his claims." *Id.* at 520 (plurality op.); *see also James v. Giles*, 221 F.3d 1074, 1077 (9th Cir. 2000) (noting that, after *Rose*, courts have long required only dismissal of a partially defective habeas petition, rather than of the entire case).[12]

---

[12]The Supreme Court recently reaffirmed the *Rose* rule that a petitioner can always amend his petition "to delete the unexhausted claims." *Rhines v. Weber*, 125 S. Ct. 1528, 1535 (2005). A significant portion of the opinion in *Rhines* was devoted to analyzing how the one-year statute of limitations period applicable to habeas petitions could work in conjunction with the total exhaustion requirement to bar any relief. *Id.* at 1533-34. The opinion for the Court noted that "the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief," *id.* at 1535, thereby providing guidance to district courts to be especially mindful of timeliness concerns when dealing with attempts to amend mixed petitions.

**[12]** Although we have noted that the analogy to habeas cases has limited applicability in the PLRA context, when a § 1983 suit contains interrelated claims, as habeas petitions invariably do, the concern regarding separating exhausted from unexhausted claims alluded to in *Rose* is relevant. For that reason, when a district court is faced with a mixed complaint containing claims that are closely related, the court should follow the approach set forth in *Rose* and its progeny: dismiss the complaint and allow the plaintiff the opportunity to amend his complaint to excise the unexhausted claims.

In following this procedure, we expect that district courts will exercise their usual discretion in granting leave to amend such defective complaints. *See* FED. R. CIV. P. 15(a); *Lopez*, 203 F.3d at 1130-31. We note, however, that "[l]eave to amend should be granted unless the pleading 'could not possibly be cured by the allegation of other facts,' and should be granted more liberally to pro se plaintiffs." *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (quoting *Lopez*, 203 F.3d at 1130, 1131), *cert. denied*, 124 S. Ct. 2388 (2004).

## III. Lira's Case

**[13]** The resolution of this case thus largely boils down to a question of whether it will be the district court or the prisoner who excises the unexhausted claims, either through dismissal or amendment, respectively. The district court's dismissal of Lira's case turned on its implicit, but not fully discussed, interpretation of Lira's complaint as presenting *multiple* claims regarding his validation as a Northern Structure gang member. It correlated the number of grievances filed within the California prison system with the number of claims within his complaint, and therefore did not regard his complaint as presenting a single due process claim challenging the unavailability of the evidence used against him and resulting in his placement and retention in administrative segregation.

**[14]** Lira has argued to this court, having received counsel since his last appearance in district court, that his complaint actually presents "a constellation of due process violations for his validation as a gang associate and his placement and retention in the administrative segregation at [DVI] and the SHU at Pelican Bay" that amounted to a *single*, exhausted claim.[13] Given that the district court considered Lira's case under the misapprehension that dismissal of the entire *action* was mandated if the complaint was partially defective, we remand to the district court for further proceedings. If the district judge again determines that Lira's due process claim consists of both exhausted and unexhausted claims that are intertwined, the proper course of action is for the district court (1) to allow Lira to amend his complaint so that it refers to only his fully exhausted 1996 grievance, and (2) to consider, on the merits, whether Lira states a viable due process claim on the basis of his fully exhausted 1996 grievance.

**REVERSED AND REMANDED**.

---

[13]Although we recognize that there is force to Lira's argument, we leave it to the district court to consider this new characterization of Lira's due process claim in the first instance.