**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 8, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

YU KIKUMURA,

      Plaintiff-Appellant,

    v.

A. OSAGIE; VAIL; K. SANDERS; R.
BAUER; B. GREENWOOD;
MICHAEL V. PUGH, G.L.
HERSHBERGER; KATHLEEN M.
HAWK,

      Defendants-Appellees.

No. 04-1249

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 03-B-236 (OES))**

---

Yu Kikumura filed a brief, pro se.

Richard L. Gabriel (Brittany J. Nelson with him on the briefs) of Holme Roberts
& Owen LLP, Denver, CO, for Plaintiff-Appellant in Supplemental Briefing.

Kathleen L. Torres, Assistant United States Attorney, (John W. Suthers, United
States Attorney, with her on the Answer Brief, William R. Leone, United States
Attorney, with her on the Supplemental Answer Brief) Denver, CO, for
Defendants-Appellees.

---

Before **KELLY**, **HENRY**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

Yu Kikumura, a federal prisoner, became severely ill one afternoon in his cell. Almost eight hours passed between the time when he first reported feeling sick and when he was finally taken to a doctor; a delay that Mr. Kikumura believes caused him severe injury and almost cost him his life. He filed suit in federal court alleging various Eighth Amendment and state tort claims against a number of different prison officials and the United States. The district court dismissed the entire action, citing, among other reasons, Mr. Kikumura's failure to exhaust administrative remedies or state a claim under the Eighth Amendment, and his failure to file a certificate of review for his medical malpractice Federal Tort Claims Act claims. On appeal, we address several matters relating to the Prison Litigation Reform Act's exhaustion requirement, the pleading standards for an Eighth Amendment claim of deliberate indifference, Colorado's requirement that litigants file a certificate of review demonstrating substantial justification for negligence claims arising out of professional malfeasance, and whether Colorado law recognizes a cause of action against prison guards for failing to summon medical personnel on behalf of a sick inmate.

## I. BACKGROUND

### A. The Events Surrounding Mr. Kikumura's Illness on July 5, 2002

Yu Kikumura, the plaintiff-appellant, is a federal prisoner housed at the United States Penitentiary, Administrative Maximum ("ADX"), in Florence, Colorado. Mr. Kikumura, a former member of the now-defunct terrorist group called the Japanese Red Army, was convicted on November 28, 1988, on numerous counts of interstate transportation of explosive devices and passport offenses, and is currently serving a 262-month sentence. *See United States v. Kikumura*, 947 F.2d 72, 73–74, 75 (3d Cir. 1991); *Kikumura v. United States*, 978 F. Supp. 563, 569 (D.N.J. 1997).

On July 5, 2002, Mr. Kikumura became violently ill in his prison cell. At approximately 2:30 p.m. he hit the panic button in his cell to call for help. The officers on duty that afternoon, identified as Vail and K. Sanders (together, the "Correctional Officers"), arrived at Mr. Kikumura's cell at 2:50 p.m. and observed that he "was on his floor complaining of severe cramps, pain and vomiting." Original Compl. Ex. B-1. The Correctional Officers placed a call to the prison infirmary to notify its staff of Mr. Kikumura's condition.

Mr. Anthony Osagie, a physician's assistant at the prison infirmary, arrived at Mr. Kikumura's cell at 3:15 p.m. Mr. Osagie's notes indicate that he observed Mr. Kikumura "lying on the floor on his left side [making an] extreme [and] dramatic display of pain distress." Original Compl. Ex. C-3. Mr. Osagie

instructed Mr. Kikumura to stand up and walk with him and the Correctional

Officers to the infirmary, but Mr. Kikumura "claim[ed] that he [could not] get up

because of cramps in [his] back and legs." *Id*. The Correctional Officers dragged

Mr. Kikumura to the infirmary by his arms.

Once they reached the infirmary, Mr. Osagie told Mr. Kikumura to get up

on the examination table. When Mr. Kikumura said he was unable to stand, Mr.

Osagie accused him of being "dramatic, exaggerating." Am. Compl. 5. After

what Mr. Kikumura describes as a "perfunctory exam," Mr. Osagie concluded that

Mr. Kikumura was suffering from symptoms of lactose intolerance, but otherwise

exhibited "no pathology." Am. Compl. 5–6; Original Compl. Ex. C-4. He

prescribed Mr. Kikumura "[r]eassurance and observation," gave him

acetaminophen, and encouraged him to drink plenty of fluids. Original Compl.

Ex. C-4.

The medical records indicate that Mr. Kikumura actually was suffering

from hyponatraemic encephalopathy, a serious medical condition caused by low

sodium levels in the blood.[1] Mr. Kikumura had been on a "no salt" diet for the

---

[1]*See Part 10.1: Life-Threatening Electrolyte Abnormalities*, 112 *Circulation* IV-121, IV-123 (2005). The symptoms of hyponatraemic encephalopathy include headaches, nausea, vomiting, confusion, seizures, respiratory arrest, and non-cardiogenic pulmonary oedema. Michael L. Moritz & J. Carlos Ayus, *The Pathophysiology and Treatment of Hyponatraemic Encephalopathy: An Update*, 18 *Nephrology Dialysis Transplantation* 2486, 2486 (2003). These symptoms "are largely caused by brain oedema from movement of water into the brain." *Id*.
(continued...)

previous three months. Mem. in Support of Original Compl. 2. And, on July 2, 2002, three days before he fell ill, Mr. Kikumura went for a ten-mile run in the prison yard during "extreme hot weather, probably 100° F.," and "drank [large amounts of] water and sweated a lot during and after the run[]." *Id*. Mr. Kikumura claims that his low sodium intake and excessive consumption of fluids were likely related to his development of hyponatremia.[2] *Id*. at 3.

"Symptomatic hyponatremia . . . is a medical emergency," and "[o]nce signs of encephalopathy are identified, prompt treatment is required in a monitored setting." Michael L. Moritz & J. Carlos Ayus, *The Pathophysiology and Treatment of Hyponatraemic Encephalopathy: An Update*, 18 *Nephrology Dialysis Transplantation* 2486, 2489 (2003). Mr. Osagie apparently failed to recognize that Mr. Kikumura was suffering from hyponatremia, and at 3:30 p.m. he instructed the Correctional Officers to return Mr. Kikumura to his cell. Mr. Osagie's instructions to Mr. Kikumura to drink plenty of fluids was precisely the

---

[1](...continued)
at 2487. "Acute or symptomatic hyponatremia can lead to significant rates of morbidity and mortality." Kian Peng Goh, *Management of Hyponatremia*, 69 *Am. Family Physician* 2387, 2387 (2004).

[2]*See* Christopher S.D. Almond et al., *Hyponatremia Among Runners in the Boston Marathon*, 352 *New England J. Med.* 1550, 1556 (2005) ("Excessive consumption of fluids, as evidenced by substantial weight gain while running, is the single most important factor associated with hyponatremia[,] . . . which, in rare cases, can be fatal.").

wrong advice for a patient suffering from hyponatremia, and exacerbated his condition.

After they dragged him back to his cell, the Correctional Officers had to lay Mr. Kikumura on his bed "because the severe pains and cramps had [left him] unable to stand up or walk." Am. Compl. 6. Mr. Kikumura claims that soon after he was returned to his cell his condition "rapidly deteriorated," and he began vomiting severely. *Id*. at 6. He crawled out of his bed and, "[c]ollapsing by the toilet," he continually attempted to drink water but would "throw it up violently around the floor." *Id*. He claims that his "untreated extreme cramps and pains spread throughout the whole of [his] body as if imposing . . . a torture." *Id*. The pain gave "rise to psychological anguish and horror of death, as [he] was writhing and thrashing in the waste [for] hour[s], ceaselessly screaming 'help me,' falling into a confusion which was caused by the illness that was also damaging [his] brain." *Id*.

Due to the swelling in his brain caused by the hyponatremia, Mr. Kikumura lost all memory of the remaining events of July 5, 2002 beginning sometime between 4:00 p.m. and 4:30 p.m. Based on the administrative record provided to Mr. Kikumura after the incident, however, it appears that Mr. Osagie did not take Mr. Kikumura to the infirmary again until sometime between 7:35 p.m. and 8:15

p.m.[3] By that time Mr. Kikumura's condition had deteriorated even further. His medical records indicate that he "appeared to be seizing and had some blood coming from [his] mouth." Original Compl. Ex. C-5. He was also "combative and would not offer [an] explanation as to what and where he hurts." *Id*. Mr. Osagie started providing basic treatment to Mr. Kikumura around 8:15 p.m., but his condition only worsened. At 9:25 p.m. Mr. Osagie telephoned the physician on-call, Dr. Leyba, and informed him of Mr. Kikumura's condition.

Dr. Leyba arrived at the prison infirmary at 10:20 p.m. According to Dr. Leyba's notes, when he arrived Mr. Kikumura was "in extremis," meaning at the point of death. Original Compl. Ex. C-26. He was thrashing around, seizing, and gasping for air. Dr. Leyba diagnosed him with hyponatraemic encephalopathy and acute pulmonary edema. After determining that Mr. Kikumura "could possibly demise if placed on a flat [a]mbulance gurney" and taken to "Pueblo," the nearby hospital, Dr. Leyba began treating Mr. Kikumura at the infirmary, and stayed with him until 4:30 a.m. Original Compl. Ex. C-8, C-27. According to Mr. Kikumura, by the time he finally received treatment from Dr. Leyba, he was suffering from "hyponatremic encephalopathy, acute pulmonary edema and congestive heart failure, [which were] severely damaging [his] internal organs,

---

[3]The Correctional Officer's time log for July 5, 2002 indicates that Mr. Kikumura was taken to the infirmary at 7:35 p.m. The BP-9 Administrative Response to Mr. Kikumura's formal grievance states that Mr. Osagie was called to his cell again at 8:15 p.m.

such as [his] brain, heart, lungs, liver, kidneys, stomach, tongue and mouth." Am. Compl. 7.[4]

Mr. Kikumura's condition stabilized by morning, although he did not regain consciousness for another 24 hours, and was even then "confused" and "distress[ed]." Original Compl. Ex. C-14. The medical staff returned him to his cell on July 9, 2002, four days after the onset of his illness. Mr. Kikumura claims that his "[p]hysical weakness, feeling sick, nausea, pains in [his] stomach, legs and back, limbs bruising and their pains, emotional anxiety and distress, partial memory elapsing, and difficulty in intelligent works continued till around [the] end of July." *Id*. Moreover, he asserts that "mild physical problem[s] as tangible aftereffects of the disease and mental anxiety, depression, and some difficulty for intelligent works further lasted until around [the] end of September in 2002." *Id*.

**B. Mr. Kikumura's Pursuit of Administrative Remedies**

During his recovery, Mr. Kikumura came to believe that the medical treatment he received on July 5, 2002 was inadequate. Since Mr. Kikumura lost all memory of the events on July 5, 2002 sometime between 4:00 p.m. and 4:30 p.m., however, he has no direct knowledge of what caused the alleged delay in his care after that time. Nonetheless, he was able to speak with Officer Sanders, one

---

[4]Mr. Kikumura's medical records from July 5, 2002 are largely consistent with his description of his injuries.

of the correctional officers guarding his cell when he fell ill, and to ask him what happened after he lost consciousness. According to Mr. Kikumura, Officer Sanders told him that both he and Officer Vail, the other correctional officer guarding his cell, realized that Mr. Kikumura required additional medical care soon after they first returned him to his cell at 3:30 p.m. They allegedly called the infirmary again at 4:00 p.m. to inform Mr. Osagie of Mr. Kikumura's worsening condition. Mr. Osagie did not arrive at the cell until sometime between 5:00 p.m. and 5:30 p.m. Once he arrived, Mr. Osagie supposedly observed Mr. Kikumura's deteriorating state of health, and told the Correctional Officers that he would take Mr. Kikumura to the infirmary. He then left the unit to retrieve a wheel chair for Mr. Kikumura. Although Mr. Osagie said he would be back shortly, he allegedly did not return to the cell to take Mr. Kikumura to the infirmary until 7:35 p.m.

On August 14, 2002, Mr. Kikumura filed an informal resolution form with ADX prison. He asserted that "the prison official handled [his] case wrongfully" and asked the prison authorities "to investigate the case" and discipline the "person who violated [his] constitutional rights so that the same wrong-doing [will not] happen again in this prison." Am. Compl. Ex. A-1. The prison responded to Mr. Kikumura's informal grievance on August 19, 2002. The response stated that a Correctional Counselor had reviewed the case, and

determined that he was "treated by medical staff and will continue to be treated according to [his] medical needs." *Id.*

Mr. Kikumura filed a formal administrative remedy request (a BP-9) with the Warden of ADX on August 20, 2002. In his BP-9, Mr. Kikumura complained that although he first hit the panic button in his cell at 2:30 p.m., he did not receive treatment from a doctor until 10:30 p.m., and claimed that he "suffered with a deadly consequence" as a result of this delay. *Id.*, Ex. A-2. He said that he believed "the prison officials' delayed response . . . violat[ed] [his] constitutional rights," but explained that he has "been unable to get records which show a full view on what happened [to him]." *Id.*, Ex. A-3. Nonetheless, he recounted what Officer Sanders allegedly told him regarding the delay in his treatment, which was that the Correctional Officers called the infirmary again at 4:00 p.m. to summon medical assistance, but Mr. Osagie did not arrive at the cell until 5:30 p.m., and did not take Mr. Kikumura back to the infirmary again until 7:35 p.m.

In his BP-9, Mr. Kikumura asked the Warden "to investigate the case and let [him] know . . . whether or not the [Correctional] Officers' allegation stated above is correct." *Id.* He also asked for "the content of the Unit Log in regard to the response of the prison officials [to his] sickness between 2:30 p.m. [and] 9:00 p.m. [on] July 05." *Id.* The relief sought by Mr. Kikumura was for the Warden "to take necessary action[,] including to decipline [sic] involved person[s] who

violated [his] constitutional rights according to the BOP policy or introduce new policy so that the same wrong-doing won't happen again (let me know if you found their conduct did not violate the existing policy)." *Id.* He also requested "legal relief which is appropriate under the US law and Constitution as well as necessary medical care." *Id.*

The Warden issued a response to Mr. Kikumura's BP-9 on September 11, 2002. He stated that a "review of [the BP-9] was performed," and it found the following:

> [a] Mid-Level Provider came to your cell and had you taken to the examination room on the unit. He provided you with an examination at that time[,] . . . advised you to continue taking your medication and to drink fluids[, and] . . . had you returned to your cell. Around 8:15 p.m. that evening, the Mid-Level Provider was again called to your unit. After a brief assessment, he directed staff to transport you to the Health Services Unit where he began aggressively treating your symptoms.

*Id.*, Ex. A-4. The Warden continued: "[t]he Clinical Director advises that the medical treatment you received was timely and appropriate. Staff were not deliberately indifferent to your medical needs. . . . [T]he medical care provided, and currently being provided to you is commensurate with community standards." *Id.*

Mr. Kikumura filed an appeal of the Warden's decision with the Regional Director (a BP-10) on September 19, 2002. He claimed that the Warden wrongfully concluded that the "unconstitutional conduct by the officials [was]

-11-

'timely and appropriate' and 'is commensurate with community standard[s]' under the policy, custom and practice of this prison." *Id.*, Ex. A-5. Mr. Kikumura then reasserted his claim that the prison officials had violated his constitutional rights. He also stated that if the Warden's response to his BP-9 was correct, then "the policy, custom or action by those who represent official policy in this prison are of inaction which amount[s] to failure to protect [my] constitutional rights under the 8th Amendment, constituting systematic and gross deficiencies in training and disiplin [sic] of medical staff." *Id.* Mr. Kikumura therefore requested that the Regional Director "change the policy on medical care . . . , apply[] discipline [to] those who violated my constitutional rights, [and] provid[e] . . . legal relief as well as necessary medical care." *Id.* He also asked for further "investigation [into] the case," a copy of the Unit Log, and for information from the prison about "what happened [to him on] 7/5/02." *Id.*

The Regional Director denied Mr. Kikumura's BP-10 appeal on October 15, 2002. He noted that Mr. Kikumura claimed that he "did not receive prompt and effective medical treatment for five hours when [he] was ill," and that he "request[s] that policy concerning medical care be changed, and that those who violated [his] constitutional rights be disciplined." *Id.*, Ex. A-6. The letter of denial stated that the Regional Director's Office had "reviewed [Mr. Kikumura's] institution level complaint," and found that "[t]he Warden's response adequately addresses [his] claim." *Id.* "You received adequate medical treatment," the

-12-

Regional Director wrote, "and there is no evidence that staff violated your constitutional rights by denying you such treatment." *Id*. Consequently, the Regional Director determined that Mr. Kikumura's "request to have staff disciplined [was] not warranted." *Id*.

Mr. Kikumura filed an appeal of the Regional Director's decision (a BP-11) on October 31, 2002. He explained in his BP-11 that he "was without a prompt and effective treatment from 2:30 p.m. when [he hit] a panic button to 10:20 p.m. when the doctor came," and alleged that his "deadly disease was caused not only by [Mr. Osagie's] delaying response but [also by] his fatal prescription." *Id*., Ex. A-7. He also reasserted the requests for relief from his BP-9, including a "change [to] the policy on medical care," "discipline [for] those who violated [his] constitutional rights," "legal relief," "continuing necessary medical care," an investigation into the case, and copies of the documents he had requested. *Id*. On November 29, 2002, the Administrator of National Inmate Appeals denied Mr. Kikumura's BP-11. The Administrator found "no indication that medical care and treatment was delayed" and that Mr. Kikumura "received treatment in accordance with the symptoms [he] presented to medical staff." *Id*., Ex. A-8.

In addition to pursuing his Eighth Amendment claim through the inmate-grievance process, Mr. Kikumura also filed an administrative claim under the Federal Tort Claims Act (FTCA) with the Federal Bureau of Prisons (BOP). He filed his first FTCA administrative claim on September 17, 2002, alleging that

Mr. Osagie's negligence in treating him caused severe injuries. On December 20, 2002, he filed a supplemental administrative claim asserting that Officers Vail and Sanders were also negligent. The BOP denied his claim on March 7, 2003, concluding that Mr. Kikumura did not "suffer[] any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment." Am. Compl. Ex. A-9.

## C. Proceedings in District Court

Mr. Kikumura, acting pro se, filed a complaint in the United States District Court for the District of Colorado on February 7, 2003, asserting various causes of action under the Eighth Amendment. The district court referred the lawsuit to a magistrate judge. Mr. Kikumura amended his complaint on May 28, 2003.

In his amended complaint, Mr. Kikumura asserted fourteen claims against eight defendants. The named defendants were Anthony Osagie, the physician's assistant who treated Mr. Kikumura; Officers Vail and Sanders, the two correctional officers guarding his cell unit when he fell ill; R. Bauer, a Captain in the United States Public Health Service and the Health Services Administrator at ADX; B. Greenwood, also a Captain in the United States Public Health Service and the Assistant Health Services Administrator at ADX; M. V. Pugh, the Warden of ADX; J. Burrell, the Associate Warden of ADX; and the United States of America.

-14-

The first six claims assert a right of recovery against the individual defendants pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of the Eighth Amendment guarantee against cruel and unusual punishment. These six claims for deliberate indifference are, respectively: (1) Mr. Osagie provided inadequate medical care to Mr. Kikumura when he first arrived at the infirmary; (2) Mr. Osagie failed to alleviate Mr. Kikumura's pain and suffering before sending him back to his cell; (3) Mr. Osagie failed to fulfill his gatekeeper role by waiting almost six hours before calling the prison doctor; (4) Mr. Osagie deliberately left Mr. Kikumura in his cell for at least two hours after learning of his acute medical condition; (5) Officers Vail and Sanders knew that Mr. Kikumura required serious medical attention soon after they returned him to his cell, but delayed calling the infirmary for up to four hours; and (6) Captain Bauer, Captain Greenwood, Warden Pugh, and Assistant Warden Burrell (together the "Supervisory Defendants") failed to provide adequate training and discipline to their staff, which "were closely related" to and ultimately caused Mr. Kikumura's injuries. Am. Compl. 6–14.

Mr. Kikumura's remaining eight claims assert a right of recovery against the United States under the FTCA for various state-law torts allegedly committed by the individual defendants. The seventh through the fourteenth claims are, respectively: (7) Mr. Osagie negligently failed to take reasonable care in providing Mr. Kikumura medical care; (8) Mr. Osagie negligently failed to detect

-15-

or diagnose Mr. Kikumura's emergency medical condition; (9) Mr. Osagie negligently failed to refer Mr. Kikumura's case to the prison doctor until 9:25 p.m.; (10) Mr. Osagie negligently misrepresented Mr. Kikumura's state of health to the Correctional Officers when he accused him of malingering; (11) Mr. Osagie engaged in extreme and outrageous conduct; (12) Officers Vail and Sanders negligently delayed calling the infirmary a second time after Mr. Kikumura's condition deteriorated; (13) Officers Vail and Sanders engaged in extreme and outrageous conduct; and (14) the Supervisory Defendants negligently failed to adequately train and discipline the ADX staff, and are liable under respondeat superior.

On August 18, 2003, the defendants filed a consolidated motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), asserting various reasons for the dismissal of all fourteen of Mr. Kikumura's claims. With respect to the *Bivens* claims, the Defendants argued, among other things, that Mr. Kikumura had failed to state a claim under the Eighth Amendment, and that because he "did not identify Defendants Vail, Sanders, Pugh, Burrell, Bauer or Greenwood in any of the grievances he filed," he "failed to exhaust his administrative remedies against these Defendants." Mot. to Dismiss 4. They also argued that Mr. Kikumura's FTCA claims based on Mr. Osagie's alleged malfeasance should be dismissed because he failed to file a

certificate of review demonstrating "substantial justification" for the claims, as required by Colo. Rev. Stat. § 13-20-602.

In response to the Defendants' allegation that he failed to exhaust his administrative remedies on his *Bivens* claims, Mr. Kikumura submitted a renewed BP-9 grievance form to the Warden. This new BP-9, filed on August 27, 2003, listed the individual defendants by name and specifically mentioned his Eighth Amendment claims. The Warden rejected his renewed BP-9 filing as untimely, noting that BP-9s must be received within 20 days of the event complained about. Mr. Kikumura appealed the denial by means of a BP-10 to the Regional Director, which was rejected, and then filed a BP-11 addressed to the General Counsel, which was also rejected. After receiving the final rejection, Mr. Kikumura submitted copies of all of these documents to the magistrate judge.

Mr. Kikumura filed his response to the Defendants' motion to dismiss on September 24, 2003. Although he responded to most of the Defendants' arguments, Mr. Kikumura asked the Court for an extension on the deadline to file a certificate of review, explaining that he did not know of the requirement until he read the motion to dismiss. He also asked the magistrate judge to appoint him counsel, arguing that he needed an attorney to make "contact with a licensed physician who could provide [him] a Certificate of Review," and that the legal issues involved in the Defendants' administrative-exhaustion argument were too

"novel and complex" for a pro se litigant to properly address. Resp. to Mot. to Dismiss 8, 24.

A week later, Mr. Kikumura filed a motion for a temporary restraining order ("TRO") to enjoin BOP officials from destroying evidence. In particular, he asked the magistrate judge to enjoin the destruction of administrative grievances filed by other inmates that might help show that the ADX employees received inadequate training. Additionally, on October 17, 2003, Mr. Kikumura filed another motion for an extension of time to file a certificate of review and for appointment of counsel.

On March 24, 2004, the magistrate judge entered an order recommending that the district court grant the Defendants' motion to dismiss, and deny all other pending motions as moot. The magistrate judge's decision was based on the following findings: (1) Mr. Kikumura failed to exhaust his administrative remedies for his *Bivens* claim against the Supervisory Defendants; (2) the FTCA provides Captain Bauer and Captain Greenwood absolute immunity from the *Bivens* claim because they are United States Public Health Service officers; (3) the facts alleged in the complaint are insufficient to state a claim under the Eighth Amendment against any of the individual defendants; (4) the Defendants are all entitled to qualified immunity; (5) Mr. Kikumura failed to submit a certificate of review, as required under Colorado law, for his FTCA claims based upon Mr. Osagie's allegedly negligent and outrageous conduct; (6) the "negligent

-18-

misrepresentation" claim is frivolous and unexhausted; (7) the United States has not waived sovereign immunity over Mr. Kikumura's claims based on the Correctional Officers' "failure to refer or consult" and "outrageous conduct," or over his claim based on respondeat superior.

Mr. Kikumura filed his objections to the magistrate judge's recommendation on April 26, 2004, disputing all of the grounds given by the magistrate judge for dismissing his fourteen claims. He also renewed his motions for a TRO, appointment of counsel, and an extension of time for filing a certificate of review. Objections to Mag. Rec. 25. Additionally, Mr. Kikumura argued that unless his request for counsel and an extension of time were granted, the Certificate of Review requirement imposed under Colo. Rev. Stat. § 13-20-602 would be unconstitutional as applied to him.

On June 16, 2004, the district court issued an order adopting all of the magistrate judge's recommendations with respect to the fourteen claims asserted in Mr. Kikumura's complaint, and therefore dismissed the entire action with prejudice. The district court also denied all of Mr. Kikumura's pending motions, but did so on their merits rather than for mootness.

Mr. Kikumura filed a notice of appeal on June 23, 2004.

**D. The Appeal**

Mr. Kikumura argues that the district court's order dismissing his amended complaint was erroneous with respect to all fourteen of his claims. He also asks this Court to reverse the district court's order denying his motions for appointment of counsel, an extension of time to file a Certificate of Review, and a TRO prohibiting the BOP from destroying evidence. He also submitted a motion requesting the appointment of counsel for this appeal.

In their Answer Brief, the Defendants raise two arguments on appeal in addition to responding to Mr. Kikumura's various contentions. First, they argue that the district court erred in finding that Mr. Kikumura exhausted his administrative remedies for his *Bivens* claim against the Correctional Officers. Second, they contend that Mr. Kikumura's entire action should be dismissed pursuant to the total exhaustion rule announced in *Ross v. County of Bernalillo*, 365 F.3d 1181 (10th Cir. 2004), which was decided after the magistrate judge issued his Order recommending that all fourteen of Mr. Kikumura's claims be dismissed on their merits.

On September 1, 2005, we granted Mr. Kikumura's motion for appointment of counsel for the appeal. We also directed the parties to submit supplemental briefing on two issues:

> 1. Did Mr. Kikumura adequately exhaust his administrative remedies
> in this case with respect to the claims he raised in his *Bivens*
> complaint, as required by 42 U.S.C. § 1997e(a)?

2. If he failed to exhaust any of his claims, should the district court have dismissed his entire complaint without prejudice, pursuant to this circuit's total exhaustion rule? *See Ross v. County of Bernalillo*, 365 F.3d 1181, 1190 (10th Cir. 2004).

Order, Sept. 1, 2005, at 3.

## II. DISCUSSION

### A. Exhaustion of Administrative Remedies for the *Bivens* Claims

In 1996, as part of the Prison Litigation Reform Act (PLRA), Congress established a mandatory exhaustion requirement for inmates challenging prison conditions in federal court. Pub. L. No. 104-134, 110 Stat. 1321 (1996). Section 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

As a federal prisoner, Mr. Kikumura had to pursue his claims through the BOP's administrative remedy program before initiating his lawsuit. *See Patel v. Fleming*, 415 F.3d 1105, 1109 (10th Cir. 2005). The BOP requires inmates to "first present an issue of concern informally to staff." 28 C.F.R. § 542.13(a).

-21-

Inmates who wish to pursue their grievance further may file "a formal written Administrative Remedy Request, on the appropriate form (BP-9)" with the Warden of the prison, so long as they act within "20 calendar days following the date on which the basis for the request occurred." 28 C.F.R. § 542.14(a). If "not satisfied with the Warden's response," they "may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). Finally, "[a]n inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response." *Id*.

After recovering from his injuries, Mr. Kikumura pursued his grievance through all four steps of the administrative process. He filed an informal grievance with the prison regarding the medical treatment he received on July 5, 2002, followed by a formal BP-9 grievance, and then successive BP-10 and BP-11 appeals. The BOP accepted each filing as timely, addressed most of Mr. Kikumura's claims on their merits, and denied his requests for relief.

The Defendants argue that even though Mr. Kikumura proceeded through all four stages of the grievance process, he did not properly exhaust his claims against each of the individual defendants. They contend that because Mr. Kikumura's BP-9 focused on the alleged malfeasance of Mr. Osagie, and did not

-22-

mention any of the other defendants, he failed to exhaust his *Bivens* claims against the Correctional Officers and Supervisory Defendants.

The magistrate judge accepted part, but not all, of the Defendants' argument. Contrary to the Defendants' position, the magistrate judge concluded that Mr. Kikumura satisfied the exhaustion requirements for his claim against the Correctional Officers, explaining that "although plaintiff does not provide names for them [in his grievance filings], plaintiff does provide sufficient information to put prison administrators on notice in regard to the identities of the parties about whom plaintiff was making complaint, and the nature of the claim he was making." Mag. Rec. 14–15. At the same time, however, the magistrate judge determined that Mr. Kikumura failed to exhaust his *Bivens* claim against the Supervisory Defendants because the "broad conclusory statement" regarding prison policy in the BP-9 "does not provide notice to prison administrators about any specific complaint that plaintiff might have had." *Id*. at 15–16. The district court adopted both of these findings in the order dismissing Mr. Kikumura's complaint. We review the district court's decision de novo. *Patel*, 415 F.3d at 1108.

When an inmate completes all of the administrative steps required by prison regulations, "[a] showing of exhaustion . . . [is] dependent upon insight into the administrative claim and its relationship with the federal suit." *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1210 (10th Cir. 2003). There is no doubt

that "[a] litigant's failure to raise issues during an administrative appeal can constitute a failure to exhaust administrative remedies." *Kikumura v. Hurley*, 242 F.3d 950, 956 (10th Cir. 2001). This Court has not, however, determined how much information prisoners must provide in their administrative grievances to satisfy the PLRA's exhaustion requirement.

As an initial matter, we note our agreement with the Seventh Circuit that the question of "what things an administrative grievance must contain" is first a "choice-of-law issue." *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). Since § 1997e(a) does not specify the procedural requirements necessary for exhaustion, "the rules come from the prison grievance systems themselves — state law for state prisons, federal administrative law for federal prisons." *Id*. (holding that "grievances must contain the sort of information that the administrative system requires").[5] In this case, however, the regulations governing the BOP's administrative remedy program do not specify the kind of information needed in a grievance. *See* 28 C.F.R. §§ 540.10 & 542.15. Consequently, this case requires us to craft a rule for when the prison regulations are silent.

---

[5]According to *Strong*, "[t]he only constraint" on administrative remedy programs "is that no prison system may establish a requirement inconsistent with the federal policy underlying § 1983 and § 1997e(a)." *Strong*, 297 F.3d at 649. Since the BOP has not set forth any regulations concerning the factual particularity required in a grievance, there is no need for us to evaluate the agency's regulations in light of § 1983 and § 1997e(a).

The Defendants argue that this Court should adopt "a rule that requires the inmate to include in his grievance the identity, either by name or description, of the alleged wrongdoer and the nature of the wrongdoing." Appellees' Supp. Br. 23–24. They rely on cases such as *Curry v. Scott*, 249 F.3d 493 (6th Cir. 2001), where the Sixth Circuit held that a prisoner must "file a grievance against the person he ultimately seeks to sue" to satisfy the exhaustion requirement of § 1997e(a). *Id.* at 505; *see also Burton v. Jones*, 321 F.3d 569, 575 (6th Cir. 2003) ("[F]or a court to find that a prisoner has administratively exhausted a claim against a particular defendant, a prisoner must have alleged mistreatment or misconduct on the part of the defendant."); *Abdul-Muhammad v. Kempker*, 450 F.3d 350, 351–52 (8th Cir. 2006) (adopting the Sixth Circuit's approach). Because Mr. Kikumura's administrative grievance did not identify the Correctional Officers or Supervisory Defendants as wrongdoers, the Defendants contend that he failed to exhaust his administrative remedies as to those individuals.

Mr. Kikumura contends that a grievance satisfies the exhaustion requirements of § 1997e(a) so long as it "alert[s] the BOP officials to the nature of the wrongs by the prison staff." Appellant's Reply Br. 5. In *Strong*, the Seventh Circuit adopted this rule. Judge Easterbrook, writing for the panel, concluded that:

When the administrative rulebook is silent, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in the notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.

297 F.3d at 650. The Second Circuit adopted a similar standard in *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (Calabresi, J.). *Johnson* holds that "[u]ncounselled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading." *Id*. at 697. Since "the PLRA's exhaustion requirement does require that prison officials be 'afford[ed] . . . time and opportunity to address complaints internally,'" however, the court found that "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Id*. (quoting *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002)).

Without a controlling statutory provision or regulation to guide our analysis in choosing between these two rules, we must look to the purposes of § 1997e(a) to determine what information an inmate must provide in a grievance. In *Woodford v. Ngo*, the Supreme Court stated that "[t]he PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'"

__ U.S. __, 126 S. Ct. 2378, 2387 (2006) (quoting *Nussle*, 534 U.S. at 525 (alteration omitted)).  The Court found that "[r]equiring proper exhaustion serves all of these goals," but "only if the prison grievance system is given a fair opportunity to consider the grievance."  *Woodford*, __ U.S. at __, __, 126 S. Ct. at 2387, 2388.  The reasoning of *Woodford* thus lends support to the approach followed by the Second and Seventh Circuits: that a grievance will satisfy the exhaustion requirement so long as it is not "so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006).

The Defendants contend that this approach asks too little of prisoners, and assert that the "reasonableness" of a rule requiring inmates to identify alleged wrongdoers in their grievance is "apparent."  Appellees' Supp. Br. 23.  We are unconvinced.  The Supreme Court has cautioned that "the creation of an additional procedural technicality . . . [is] particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Love v. Pullman Co.*, 404 U.S. 522, 526–27 (1972).  Not only do inmates typically file their grievances pro se, but BOP procedures allow prisoners just twenty days from the date of their injury to file a grievance; they are allowed less than a page and a half to write out a complaint; and, because they are incarcerated, the inmates often cannot investigate their own claims to identify the alleged wrongdoers.  28 C.F.R. §§ 542.14(a) & (c)(3); Am. Compl. Ex. A-2;

-27-

*Brown v. Sikes*, 212 F.3d 1205, 1209 n.4 (11th Cir. 2000) (noting that "[a]ppellate courts have acknowledged the difficulties faced by a prisoner in identifying alleged wrongdoers before filing a complaint."). Additionally, the BOP administrative remedy program does not provide inmates a procedural mechanism for amending their grievances to identify additional defendants or provide new information about their claims, and federal regulations prohibit inmates from raising new issues in their administrative appeals. 28 C.F.R. § 542.15(b)(2). Given this procedural context, we do not find it so "apparent" that inmates must be required to specifically identify the wrongdoers in their initial grievance.

Mr. Kikumura's diligent, but ultimately unsuccessful, attempt to identify all of the alleged wrongdoers in his grievance illustrates the problem. Because of his memory loss caused by the hyponatremia, Mr. Kikumura was unaware of the Correctional Officers' alleged malfeasance at the time he filed his initial grievance. With respect to his claim against the Supervisory Defendants, Mr. Kikumura explains that "[i]t is not [an] easy task for a prisoner" such as himself to learn the "chain of command in the prison and its administrative system so as to claim the issue[s] in detail[]" in a grievance. Appellant's Br. P18-3. Mr. Kikumura's best opportunity to identify any possible malfeasance was through the grievance process itself, and in his BP-9 he asked for the Warden "to investigate the case and let [him] know the result[s]" of the investigation. Am. Compl. Ex.

-28-

A-3. Yet, under the Defendants' proposed rule, Mr. Kikumura would be limited to his specific allegations of wrongdoing in the initial grievance.

We also reject the Defendants' contention that the standard for exhaustion applied in the Second and Seventh Circuits — which requires inmates to provide enough information in their grievances for prison officials to address the complaint internally — turns the grievance process into "an empty formality." Appellees' Supp. Br. 23. The BOP administrative remedy program is an inquisitorial system designed "to solve problems and be responsive to issues inmates raise." U.S. Dep't of Justice, Bureau of Prisons Program Statement No. 1330.13, at 10 (Aug. 13, 2002) ("Program Statement"). Properly submitted grievances must be "investigated thoroughly" by independent prison officials, and records of "all relevant information developed in the investigation," including written statements from other staff members regarding matters raised in the grievance, "shall be retained with the case file." *Id*. at 12. The inquisitorial model adopted by the BOP is consistent with a rule allowing inmates to exhaust their administrative remedies with a grievance that provides prison officials a fair opportunity to investigate and resolve the complaint internally even without specifically identifying wrongdoers. *Cf. Sims v. Apfel*, 530 U.S. 103, 109 (2000) ("[T]he desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding.").

The Defendants also assert that inmates should be required to identify wrongdoers in their grievances because the federal prison system receives "thousands of inmate grievances" each year, and "the prison administration process should not be required to cast a wide investigative net in order to identify and resolve all possible claims." Appellees' Supp. Br. 22. The policy considerations are not quite so straightforward, however. The grievance forms now supplied to federal inmates are designed to "encourage a simple and straightforward statement of the inmate's grievance," and inmates may place no more than "a single complaint or a reasonable number of closely related issues on the form." 28 C.F.R. §§ 40.7(a), 542.14(c)(2). These restrictions are intended to "facilitate[] indexing, and promote[] efficient, timely and comprehensive attention to the issues raised" in the grievance. Program Statement 7. A rule that penalizes inmates for failing to identify defendants as wrongdoers might undermine these goals by encouraging inmates to list in their grievances anyone who might possibly be involved in the alleged wrongdoing, rather than focusing on the most likely perpetrator or cause of their injury. We do not know whether the BOP would prefer longer and more detailed grievances from its inmates, as the Defendants' proposed rule would seem to foster. Fortunately, it is not our place to make that decision. If the BOP wants inmates to provide more information, it can make that determination itself through the rulemaking process.

Finally, and perhaps most importantly, we note the absence of any evidence that Mr. Kikumura was ever informed he was required to identify the wrongdoers in his grievances. If the BOP wants inmates to provide specific types of information in their grievances, it should notify them of those requirements in advance rather than waiting until they have already completed the grievance process and filed a lawsuit. *See Sims*, 530 U.S. at 113 (O'Connor, J., concurring); *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). Without such notice, we hold that a grievance satisfies § 1997e(a)'s exhaustion requirement so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally.

We agree with the district court that Mr. Kikumura exhausted his administrative remedies against Mr. Osagie and the two Correctional Officers under this standard. In his BP-9, Mr. Kikumura described the events surrounding his injury as best he could: he claimed that he was negligently denied medical treatment; he identified the various people he knew to be involved in the incident; he recounted Officer Sanders's alleged version of events, which blamed Mr. Osagie for the delay in medical treatment; he asked for an investigation into his case; and he requested any legal relief to which he might be entitled. This information was sufficient to enable prison officials to investigate Mr. Kikumura's complaint against Mr. Osagie and the Correctional Officers, even

though he did not accuse the latter two defendants of wrongdoing until he filed his complaint in federal court.

We also affirm the district court's finding that Mr. Kikumura failed to exhaust his administrative remedies against the four Supervisory Defendants, Captain Bauer, Captain Greenwood, Warden Pugh, and Assistant Warden Burrell. Claim six of the amended complaint accuses these four defendants of violating Mr. Kikumura's Eighth Amendment rights by failing to provide adequate training and discipline to the prison staff. In his BP-9, however, Mr. Kikumura's only reference to prison "policy" is where he asks the Warden "to take necessary action[,] including to deciplne [sic] involved person[s] who violated my constitutional rights according to the BOP policy or introduce new policy so that the same wrong-doing won't happen again." Am. Compl. Ex. A-3. Although this statement implies that Mr. Kikumura's injuries may have been caused by the old prison policies, the vague reference to "policy" was insufficient to notify prison officials that the injuries might have been caused by inadequate training and disciplinary programs at the prison. Since prison officials were unlikely to recognize the need to investigate these claims, the BP-9 did not provide the prison with a fair opportunity to resolve Mr. Kikumura's complaint against the Supervisory Defendants. The sixth claim is therefore unexhausted.[6]

_____

[6]Mr. Kikumura argues that even if he failed to exhaust his claim against the
(continued...)

-32-

## B. The Total Exhaustion Rule

Since Mr. Kikumura failed to exhaust one of his claims, we must decide

whether his entire complaint should be dismissed under the total exhaustion rule.

In *Ross v. County of Bernalillo*, 365 F.3d 1181 (10th Cir. 2004), we held that the

PLRA requires total exhaustion of claims asserted in a prisoner lawsuit, and

therefore "mixed" actions containing both exhausted and unexhausted claims must

be dismissed in their entirety without prejudice. *Id*. at 1190.[7] The Defendants

contend that *Ross* requires us to dismiss this action. In one respect, however, this

case differs from *Ross*. At the time the court ordered dismissal in *Ross*, it was

---

[6](...continued)
Supervisory Defendants in his BP-9, the Regional Director cured that failure by addressing the merits of the claim in the response to his BP-10 appeal. Mr. Kikumura misreads the BP-10 response. Although the opening paragraph of the BP-10 response acknowledges his claim regarding the prison's "policy concerning medical care," it does not address the claim on its merits, Am. Compl. Ex. A-6, and therefore does not cure his failure to exhaust the claim. *See Patel v. Fleming*, 415 F.3d 1105, 1111 (10th Cir. 2005).

[7]There are differing views among the Courts of Appeals as to whether the PLRA should be read to contain a total exhaustion requirement. *Compare Jones Bey v. Johnson*, 407 F.3d 801, 806 (6th Cir. 2005) (adopting the total exhaustion rule), *and Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000) (same), *with Ortiz v. McBride*, 380 F.3d 649, 656 (2d Cir. 2004) (rejecting the total exhaustion rule), *Spencer v. Bouchard*, 449 F.3d 721, 726 (6th Cir. 2006) (same), *and Lira v. Herrara*, 427 F.3d 1164, 1176–77 (9th Cir. 2005) (applying the total exhaustion rule only when the "exhausted and unexhausted claims . . . are closely related and difficult to untangle"). The Supreme Court recently granted certiorari in two cases to resolve the issue. *See Jones v. Bock*, 135 Fed. Appx. 837 (6th Cir. 2005), *cert. granted*, 126 S. Ct. 1462 (U.S. Mar. 6, 2006) (No. 05-7058); *Williams v. Overton*, 136 Fed. Appx. 859 (6th Cir. 2005), *cert. granted*, 126 S. Ct. 1463 (U.S. Mar. 6, 2006) (No. 05-7142).

still possible, at least in theory, for the plaintiff to pursue his unexhausted claim within the administrative grievance system. That gave rise to concerns over piecemeal litigation. *Ross*, 365 F.3d at 1190. In this case, however, Mr. Kikumura already submitted his unexhausted claim to the grievance system, and the BOP issued a final administrative decision denying the claim as untimely—albeit all after Mr. Kikumura filed his federal lawsuit. We must therefore decide whether the total exhaustion rule applies when, after the prisoner files a "mixed" complaint, the prison issues a final order rejecting the prisoner's unexhausted claims on procedural grounds.

The answer turns on the rationale for the total exhaustion rule. The PLRA states that "[n]o action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The language of this provision does not require (or foreclose) a total exhaustion rule. In *Ross*, we noted that this language "suggests" a total exhaustion requirement "because it prohibits an 'action' (as opposed to merely preventing a 'claim') from proceeding until administrative remedies are exhausted." *Ross*, 365 F.3d at 1190. But other statutes contain similarly worded exhaustion requirements that we have not interpreted to require total exhaustion. *See, e.g.*, *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 & n.13 (10th Cir. 2005) (applying the exhaustion provision of the Americans with Disabilities Act, which states that "[n]o action . . . shall be brought . . . if

-34-

administrative remedies have not been exhausted," 42 U.S.C. § 6104(e)(2), without a total exhaustion rule.).[8] Legislatures frequently employ the phrase "no action shall be brought" in statutes of limitations, *see Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 416 (1998), obviously without intending that courts dismiss an entire action just because one of the claims asserted in the complaint is time-barred.  Accordingly, the *Ross* Court adopted the total exhaustion rule not because it was dictated by the statutory language, but because "[t]he policies of the PLRA . . . strongly support a reading of that statute that requires inmates to exhaust fully all of their claims."  *Ross*, 365 F.3d at 1190; *see also Ortiz v. McBride*, 380 F.3d 649, 656 n.3 (2d Cir. 2004) (noting that the *Ross* Court "concluded that the dismissal of a 'mixed' action was required, but relied on the language of the statute only in passing.").[9]

The *Ross* Court relied primarily on an analogy to the total exhaustion rule applicable in habeas proceedings, which it found to serve similar purposes.  In *Rose v. Lundy*, 455 U.S. 509 (1982), the Supreme Court held that when a prisoner

---

[8]Indeed, another provision of the PLRA uses almost identical language: "[n]o Federal civil action may be brought . . . for mental or emotional injury . . . without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  This has been interpreted not to require dismissal of the entire case if one claim does not qualify.  *See Robinson v. Page*, 170 F.3d 747, 748–49 (7th Cir. 1999).

[9]By contrast, in *Jones Bey v. Johnson*, 407 F.3d 801, 807 (6th Cir. 2005), the Sixth Circuit "adopt[ed] the total exhaustion rule, in large part, because the plain language of the statute dictates such a result." *See also Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000) (same).

had exhausted some but not all claims brought in a habeas petition, the district court must dismiss the entire habeas petition without prejudice. *Id.* at 510. Although the text of the habeas exhaustion provision was "too ambiguous to sustain the conclusion that Congress intended to either permit or prohibit review of mixed petitions," the Supreme Court concluded that "a rule requiring exhaustion of all claims furthers the purposes underlying the habeas statute." *Id.* at 510, 516. In particular, the Supreme Court noted that the total exhaustion rule "giv[es] the prisoner the choice of returning to state court to litigate his unexhausted claims, or of proceeding with only his exhausted claims in federal court." *Id.* at 514. Since a prisoner who proceeded with only the exhausted claims "would risk forfeiting consideration of his unexhausted claims," the Supreme Court concluded that "strict enforcement of the exhaustion requirement will encourage habeas petitioners to exhaust all of their claims in state court and to present the federal court with a single habeas petition." *Id.* at 520; *see also Ross*, 365 F.3d at 1189–90. Applying "a similar analysis," we concluded in *Ross* that "the policies underlying the PLRA point toward a requirement of total exhaustion," and thus held that if a prisoner "submit[s] a complaint containing one or more unexhausted claims, the district court ordinarily must dismiss the entire action without prejudice." 365 F.3d at 1190.[10]

_____

[10] Since our decision in *Ross*, the Supreme Court has hinted that the PLRA's

(continued...)

None of the policy considerations that led us to adopt the total exhaustion rule in *Ross* apply to the circumstances presented in this case. The *Ross* Court reasoned that the total exhaustion rule would "encourage prisoners to . . . give prison officials the first opportunity to resolve prisoner complaints," "facilitate the creation of an administrative record that would ultimately assist federal courts in addressing the prisoner's claims," "relieve district courts of the duty to determine whether certain exhausted claims are severable from other unexhausted claims," and "avoid at least some piecemeal litigation." *Id*. at 1190. Where the plaintiff submits the unexhausted claim to the prison grievance system after filing suit, and the prison issues a final rejection of that claim for untimeliness, these concerns are inapposite. The prison officials have already been given the first opportunity to resolve the complaint, the administrative record is complete, there is no need to determine whether exhausted claims are severable from unexhausted claims, and (because the unexhausted claims have been finally rejected on timeliness grounds) there is no possibility of piecemeal litigation.

---

[10](...continued)
exhaustion provision should be interpreted in light of the administrative-exhaustion doctrine rather than habeas law. *See Woodford v. Ngo*, __ U.S. __, 126 S. Ct. 2378, 2392 (2006) ("It is . . . unrealistic to infer from the wording of the PLRA provision that Congress framed and adopted that provision with habeas law and not administrative law in mind. Indeed, the wording of the PLRA provision . . . is strikingly similar to our description of the doctrine of administrative exhaustion."). The Court's administrative-exhaustion doctrine does not appear to contain a total exhaustion requirement. *See, e.g.*, *McKart v. United States*, 395 U.S. 185 (1969).

Applying the total exhaustion rule under such circumstances would simply waste judicial resources and create an unnecessary burden on litigants. The total exhaustion rule is not meant to force courts to play "a game of judicial ping-pong" with inmate lawsuits. *Harris v. Reed*, 489 U.S. 255, 270 (1989) (O'Connor, J., concurring). If we dismissed this action without prejudice, Mr. Kikumura would undoubtedly just drop the unexhausted claim from his complaint and file the action again, creating unnecessary docketing and assignment work for the district court and forcing Mr. Kikumura to pay a gratuitous filing fee. Moreover, if Mr. Kikumura were required to refile his action in the district court, his properly exhausted claims might now be barred by the applicable statutes of limitations[11] — a problematic outcome considering Mr. Kikumura's diligent efforts toward exhaustion.

In *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court crafted an exception to the habeas total exhaustion rule that was designed to prevent such an outcome. *See id.* at 277–78. The court held that "if a petitioner presents a district court with a mixed petition and the court determines that a stay and abeyance [to allow time for exhaustion in state court] is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the

---

[11]*See* 28 U.S.C. § 2401(b); Colo. Rev. Stat. §§ 13-80-102 & 102.5; *Van Tu v. Koster*, 364 F.3d 1196, 1198 (10th Cir. 2004).

petitioner's right to obtain relief." *Id*. at 278. Our interpretation of the total exhaustion rule accomplishes a similar end in the PLRA context.

Dismissing an entire action under these circumstances, where the only "unexhausted" claim in the complaint was already rejected by the prison on procedural grounds, would also be contrary to the analysis and holding of *Ross*, which was based on an analogy between the exhaustion requirement in habeas and the PLRA. In the habeas context, when a petitioner defaults his federal claims in state court by failing to comply with the state's procedural requirements, he still "meets the technical requirements for exhaustion" since "there are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). While the procedural default rule generally bars prisoners from asserting federal claims that were denied by the state courts on procedural grounds, those claims do not trigger the total exhaustion rule because they are, in fact, exhausted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 852 (1999) (Stevens, J., dissenting).[12] Just as "a [habeas] petitioner who has failed to satisfy state procedural rules meets the 'technical requirements for exhaustion'" and therefore does not trigger the total exhaustion rule, the *Ross* Court expected the same to be

---

[12]In *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999), the Supreme Court appeared to jettison its old distinction between the exhaustion rules and the procedural default doctrine in habeas law. *See id*. at 850–56 (Stevens, J., dissenting); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). But in *Woodford* the Court returned to its traditional distinction between the two doctrines. *Woodford*, __ U.S. at __, 126 S. Ct. at 2387.

true for a prisoner who has failed to satisfy the prison grievance system's procedural rules. *Ross*, 365 F.3d at 1185 (quoting *Coleman*, 501 U.S. at 732); *see also id.* at 1186 (holding "that the PLRA, like 28 U.S.C. § 2254, contains a procedural default concept within its exhaustion requirement.").

In keeping with the *Ross* Court's policy-based analysis and the analogy it drew between habeas and the PLRA, we decline Defendants' invitation to extend the PLRA's total exhaustion rule to the circumstances presented in this case. Our holding on this point has three components. First, an action containing both exhausted claims and procedurally barred claims does not fall within the scope of the total exhaustion rule. Second, this is true even if the prison grievance system did not issue a final rejection of the procedurally barred claims until after the prisoner filed suit. Third, claims that have been properly denied by the prison as untimely are, practically speaking, procedurally defaulted, and thus may be dismissed from the complaint individually and with prejudice. We discuss each of these points in turn.

The first component of our holding is that a claim rejected by the prison grievance system on procedural grounds is considered exhausted for purposes of the total exhaustion rule. This rule follows directly from the analysis and holding of *Ross*, which imported the narrow definition of exhaustion and procedural default concept of habeas into the PLRA along with the total exhaustion rule. *Ross*, 365 F.3d at 1185–86, 1189–90. We recognize that the Supreme Court

recently rejected the contention that "the wording of the PLRA exhaustion provision . . . shows that [§ 1997e(a)] was meant to incorporate the narrow technical definition of exhaustion that applies in habeas." *Woodford*, __ U.S. at __, 126 S. Ct. at 2392. Instead, the Court read the language of § 1997e(a) to impose a single requirement of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out'" in "compliance with an agency's deadlines and other critical procedural rules." *Woodford*, __ U.S. at __, __, 126 S. Ct. at 2385–86 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Under *Woodford*, therefore, claims rejected by the prison grievance system on procedural grounds are still considered unexhausted. But *Woodford* relates only to the exhaustion requirements imposed by § 1997e(a) itself, which govern whether a prisoner may obtain judicial review of a PLRA claim when he failed to meet the procedural requirements for obtaining administrative review of that claim. *Woodford* does not address the total exhaustion rule, which is a separate procedural requirement grounded in "the policies underlying the PLRA" rather than in the text of § 1997e(a). *Ross*, 365 F.3d at 1190. *Woodford* does not require us to disturb the symmetry between the total exhaustion rules in habeas and the PLRA. Although procedurally-barred claims are generally considered to be unexhausted under the PLRA for purposes of determining whether they may be pursued in court, we hold that such claims should be treated as exhausted for purposes of the total exhaustion rule, just as they are for habeas.

The second component of our holding is that the total exhaustion rule does not require dismissal of the entire action where, subsequent to the filing of the lawsuit, the prison grievance system has issued a final denial of any unexhausted claims on procedural grounds. This eliminates the danger of "piecemeal litigation" and thus satisfies the relevant policies of the total exhaustion rule. *Ross*, 365 F.3d at 1190. Where the previously unexhausted claims in a complaint have been denied by the prison grievance system on procedural grounds, whether before or after the prisoner files suit, the only effect of dismissing the entire complaint would be to unnecessarily burden the litigants and the district court.

This preserves the symmetry between the PLRA and habeas, which underlies the holding in *Ross*. After filing a "mixed" habeas petition, prisoners can avoid dismissal under the total exhaustion rule by submitting their unexhausted claims to the state courts. *See Rhines v. Weber*, 544 U.S. 269, 278 (2005). It follows that the total exhaustion rule under the PLRA must not apply to procedurally barred claims, even if the prison grievance system issued its denial of those claims after the prisoner filed his lawsuit.[13]

The third component of our holding is that a claim that has been properly rejected by the prison grievance system on procedural grounds should be

---

[13]Of course, since the PLRA requires exhaustion as a prerequisite to filing suit, *see Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1140–41 (10th Cir. 2005), courts may not grant relief to a prisoner based on a claim that was rejected by the prison on its merits subsequent to the filing of the lawsuit.

dismissed from the plaintiff's complaint with prejudice. Although "[a] dismissal based on lack of exhaustion . . . should ordinarily be without prejudice," this is because "[f]ailure to exhaust administrative remedies is often a temporary, curable, procedural flaw." *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1212–13 (10th Cir. 2003). Once a prison formally denies an inmate's grievance for untimeliness, and either the inmate does not challenge the basis for that decision or the court upholds the decision, the inmate's failure to exhaust is no longer "a temporary, curable, procedural flaw." Such a claim should be dismissed with prejudice.

After filing suit, Mr. Kikumura submitted his unexhausted claim against the Supervisory Defendants to the prison grievance system. The prison system rejected that claim as untimely, and Mr. Kikumura does not challenge that disposition. We therefore affirm the district court's order dismissing with prejudice Mr. Kikumura's *Bivens* claim against Captain Bauer, Captain Greenwood, Warden Pugh, and Assistant Warden Burrell. But contrary to the Defendants' argument, the total exhaustion rule does not require dismissal of the remaining claims in Mr. Kikumura's complaint.

**C. Failure to State a Claim under the Eighth Amendment & Qualified Immunity**

It is well established that prison officials violate the Eighth Amendment if their "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Id*. at 104–05 (footnotes omitted). At the same time, however, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id*. at 106. A complaint about "an inadvertent failure to provide adequate medical care" or "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id*. at 105–06. "Rather, 'a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 106).

The test for a "deliberate indifference" claim under the Eighth Amendment has "both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component of the test is met if the harm suffered is "sufficiently serious" to implicate the Cruel and Unusual

Punishment Clause. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The subjective component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837). Moreover, to overcome the qualified immunity defense, the prisoner "must demonstrate that the defendant's actions violated a specific constitutional right," and "then show that the constitutional right was 'clearly established' prior to the challenged official action." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

We stress the procedural context of this case. Prior to discovery, the magistrate judge ruled that Mr. Kikumura's Eighth Amendment claims failed to satisfy the objective and subjective components of deliberate indifference. The magistrate judge concluded that because Mr. Kikumura "failed to allege facts that demonstrate the actions of the defendants violated a federal or statutory right," the Defendants "are entitled to qualified immunity." Mag. Rec. 34. The district court adopted each of these holdings in its order dismissing Mr. Kikumura's action. The question before us is therefore not whether Mr. Kikumura has presented evidence in support of his complaint, but whether his allegations, if true, state a claim under the Eighth Amendment. "Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Hunt v. Uphoff*, 199 F.3d 1220, 1223 (10th Cir.

1999) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999)). "In addition to construing a pro se complaint liberally, this court 'must accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in the light most favorable to the plaintiff.'" *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (quoting *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002)).

**1. Objective Component**

To satisfy the objective component of a deliberate indifference claim arising under the Eighth Amendment, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). "[T]he purpose for this requirement is to limit claims to significant, as opposed to trivial, suffering." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). Consequently, we look to the alleged injury claimed by the prisoner, and ask "whether that harm is sufficiently serious." *Id.*

When the prisoner's Eighth Amendment claim is premised on an alleged delay in medical care, the prisoner must "show that the delay resulted in substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotation marks omitted). That "substantial harm" can be the ultimate physical injury caused by the prisoner's illness, so long as the prisoner can show that the more timely receipt of medical treatment would have minimized or

-46-

prevented the harm. *See Mata*, 427 F.3d at 753. The "substantial harm" can also be an intermediate injury, such as the pain experienced while waiting for treatment and analgesics. *Id.* Although "not every twinge of pain suffered as a result of delay in medical care is actionable," when the pain experienced during the delay is substantial, the prisoner "sufficiently establishes the objective element of the deliberate indifference test." *Sealock*, 218 F.3d at 1210.

Mr. Kikumura claims that he experienced severe pain after being sent back to his cell from the infirmary by Mr. Osagie. His complaint provides the following description of events:

> [After they] returned me to the cell[,] . . . I was laid on the bed by the [Correctional Officers] because the severe pains and cramps had me unable to stand up or walk. There, my condition was rapidly deteriorated. Following severe vomiting up to the bedside after approximately 1530, I crept toward the toilet for water. Collapsing by the toilet, endlessly letting me drink many water and throw it up violently around the floor, untreated extreme cramps and pains spread throughout the whole of my body as if imposing me a torture. It gave me rise to psychological anguish and horror of death, as I was writhing and thrashing in the waste all hour, ceaselessly screaming "help me," falling into a confusion which was caused by the illness that was also damaging my brain. And then finally my memory ceased around 1600–1630. Even thereafter, I continued tormented with those torturous physical injury, pains and distress, and extreme psychological anguish (for next 12 hours until I returned to stable condition).

Am. Compl. 6 (grammatical errors in original).

Additionally, if we read Mr. Kikumura's complaint liberally, he also claims that the delay in treatment "caused" his "physical injury"; presumably because

-47-

earlier treatment would have stopped the hyponatremia from reaching a critical stage. Am. Compl. 8. Mr. Kikumura describes his ultimate injury from the delay as follows:

> When prison doctor Dr. Leyba arrived at me around 2220, I was 'an acute status thrashing following a seizure like reaction' and 'in extremus,' and he took aggressive care of my medical condition throughout the night. I suffered with medical injury with hyponatremic encephalopathy, acute pulmonary adema and congestive heart failure, severely damaging internal organs, such as brain, heart, lungs, liver, kidneys, stomach, tongue and mouth. . . . I was placed on emergency response status between 7/5 at 2228 to 7/8 at 0600. . . . Physical weakness, feeling sick, nausea, pains in stomach, legs and back, limbs bruising and their pains, emotional anxiety and distress, partial memory elapsing, and difficulty in intelligent works continued till around end of July, and mild physical problem as tangible aftereffects of the disease and mental anxiety, depression, and some difficulty for intelligent works further lasted until around end of September in 2002.

Am. Compl. 7 (grammatical and spelling errors in original).

The "torturous" pain Mr. Kikumura allegedly experienced as a result of the delay in medical care, along with his significant physical injuries, is enough to satisfy the "substantial harm" requirement of the objective component of a deliberate indifference claim.

**2. Subjective Component**

The more difficult issue raised by the district court's findings is whether Mr. Kikumura can prove a set of facts sufficient to satisfy the subjective component of his deliberate indifference claims against Mr. Osagie, Officer Vail, and Officer Sanders. The subjective component of a deliberate indifference claim

-48-

requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). It is not enough to allege that prison officials failed "to alleviate a significant risk that [they] should have perceived but did not." *Id*. To show "the requisite deliberate indifference," Mr. Kikumura "must establish that defendant(s) knew he faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847). We first address Mr. Kikumura's four Eighth Amendment claims against Mr. Osagie, followed by his Eighth Amendment claim against the Correctional Officers.

### a. Mr. Osagie

Mr. Kikumura asserts four claims against Mr. Osagie for deliberate indifference, each centering on a separate accusation. Those accusations are, respectively: (1) Mr. Osagie failed to provide adequate medical treatment to Mr. Kikumura when he first arrived at the infirmary; (2) Mr. Osagie failed to alleviate Mr. Kikumura's pain and suffering; (3) Mr. Osagie failed to fulfill his gatekeeper role by waiting approximately six hours before calling the prison doctor; and (4) after Mr. Osagie was summoned to Mr. Kikumura's cell a second time, he knew that Mr. Kikumura's medical condition was "extremely acute" and yet failed to take him to the infirmary for at least another two hours.

Based on the magistrate judge's recommendation, the district court dismissed all four of Mr. Kikumura's Eighth Amendment claims against Mr. Osagie on the ground that Mr. Kikumura "alleged no facts that demonstrate" that Mr. Osagie possessed "a sufficiently culpable state of mind." Mag. Rec. 24 (internal quotation marks omitted). This was an error. Mr. Kikumura is merely required to provide "a short and plain statement" of his Eighth Amendment claims, Fed. R. Civ. P. 8(a), and "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally" in the complaint, Fed. R. Civ. P. 9(b). *See Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001); *McBride v. Deer*, 240 F.3d 1287, 1290 (10th Cir. 2001). According to Mr. Kikumura's amended complaint, Mr. Osagie "knew" that Mr. Kikumura "require[d] prompt medical attention and . . . that delay would exacerbate [his] health problem," but deliberately "disregarded that risk." Am. Compl. 9. These allegations satisfy the pleading requirement of Rule 8(a) for the subjective component of a deliberate indifference claim.

Of course, even when Eighth Amendment claims meet the pleading requirements of Rule 8(a), those claims should still be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). Since the subjective component of deliberate indifference is based on the prison officials' state of mind, it is "a question of fact subject to demonstration in the

-50-

usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Although plaintiffs are not required to plead specific facts demonstrating defendants' culpable state of mind, they can still undermine their own case by asserting facts incompatible with a deliberate indifference claim. The district court dismissed Mr. Kikumura's Eighth Amendment claims against Mr. Osagie on this ground.

Mr. Kikumura identifies specific facts in his complaint from which a jury could infer that Mr. Osagie knew about the substantial risk of serious harm posed by his illness. Mr. Kikumura alleges that when he first arrived at the infirmary, the severity of his symptoms was "so obvious and substantial" — including his extreme pain, nausea, and inability to stand or walk — that Mr. Osagie "must have known" he "require[d] prompt medical attention and . . . that delay would exacerbate [his] health problem [and] . . . was likely to inflict or prolong unnecessary pain and suffering." Am. Compl. 8, 10, 12. It is well established that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006) (a "jury may infer conscious disregard" when a prison doctor "responds to an obvious risk with treatment that is patently unreasonable."). A jury could therefore infer from the alleged "obviousness" of Mr. Kikumura's condition that Mr. Osagie knew of the significant risk of harm.

Nonetheless, the magistrate judge determined that Mr. Kikumura's Eighth Amendment claims against Mr. Osagie were, in reality, just claims for negligent misdiagnosis and malpractice, and thus failed to satisfy the subjective component of the deliberate indifference test. This conclusion finds support in some of the factual allegations in the complaint. Mr. Kikumura admits that Mr. Osagie examined him at the infirmary, reported that he found "no pathology" other than lactose intolerance, and gave him acetaminophen before sending him back to his cell. Am. Compl. 5–6; *id.*, Ex. A-8. These allegations, without more, suggest that Mr. Osagie made a good faith attempt to treat Mr. Kikumura and did not act with deliberate indifference.

In other portions of the complaint, however, Mr. Kikumura presents allegations that the medical treatment he received was merely a façade that hid Mr. Osagie's intentional and reckless disregard for Mr. Kikumura's well-being. Mr. Kikumura claims that Mr. Osagie "knew" he "require[d] prompt medical attention" when he first arrived at the infirmary, but was "already prejudiced" against him, and therefore chose not "to verify underlying facts of [his] excruciating sufferings" because he knew it "would bring him [to the] conclusion that something was not right." Am. Compl. 5, 8. Instead, Mr. Osagie conducted a "perfunctory exam," announced that there was "no pathology elicited," provided medical treatment "so cursory as to amount to no treatment at all," and sent Mr. Kikumura back to his cell. *Id.* at 5–6, 8 (internal quotation marks omitted).

Moreover, even if Mr. Osagie's initial misdiagnosis was merely negligent, the allegation that Mr. Osagie delayed treatment for approximately two hours even after he had realized the seriousness of Mr. Kikumura's condition later that afternoon could support a claim of deliberate indifference. At this stage in the proceeding, we do not know whether these allegations can be substantiated, but it is not "beyond doubt" that Mr. Kikumura "can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46.

We therefore find that the allegations in Mr. Kikumura's amended complaint are sufficient to satisfy the subjective component of his deliberate indifference claims against Mr. Osagie. As previously noted, Mr. Kikumura's claims against Mr. Osagie also satisfy the objective component. Consequently, we find that all four of Mr. Kikumura's deliberate indifference claims against Mr. Osagie state a claim upon which relief could be granted. Of course, we express no opinion on whether these claims will withstand summary judgment or be proved on the merits.

### b. The Correctional Officers

Mr. Kikumura alleges that Officers Vail and Sanders violated the Eighth Amendment by leaving him in his cell for several hours while his condition worsened, before calling the infirmary again. According to the complaint, Mr. Kikumura's condition "rapidly deteriorated" soon after he was returned from the infirmary to his cell at 3:30 p.m. Am. Compl. 6. The complaint states that the

-53-

Correctional Officers had at least four separate opportunities between 4:00 p.m. and 5:30 p.m. to view Mr. Kikumura in his cell, and they therefore "knew" that Mr. Kikumura's "health problem was exacerbated" and that he "require[d] immediate medical attention." *Id*. at 12. Mr. Kikumura also alleges that Officer Sanders told him that both he and Officer Vail knew Mr. Kikumura needed serious medical attention sometime around 4:00 p.m. Nonetheless, the Correctional Officers "disregarded that risk" and "recklessly, knowingly, or intentionally" delayed calling the infirmary again until 7:35 p.m. *Id*.

The magistrate judge identified three reasons why Mr. Kikumura's claim against the Correctional Officers could not satisfy the subjective component of the deliberate indifference test. The district court accepted all three findings in its order dismissing Mr. Kikumura's action. We consider each in turn.

First, the magistrate judge determined that the Correctional Officers could not have had the requisite "culpable state of mind" because "they are not medical personnel," and therefore were not "in a position to challenge or second-guess the conclusion that had been reached by Osagie." Mag. Rec. 25. This finding disregards Officer Sanders's alleged self-incriminatory statement — which we assume he truly made for purposes of this appeal — that by 4:00 p.m. he and Officer Vail both knew Mr. Kikumura required immediate medical attention. Moreover, given that Mr. Kikumura's health had "rapidly deteriorated," it is possible that even a lay person could have recognized a change in circumstances

-54-

necessitating emergency medical treatment. In light of these allegations, we do not believe that the Correctional Officers' lack of medical training necessarily defeats the inference that they disregarded a known risk of serious harm to Mr. Kikumura.

Second, the magistrate judge concluded that Mr. Kikumura's deliberate indifference claim against the Correctional Officers is inconsistent with other factual allegations in his complaint. In support of his fourth deliberate indifference claim against Mr. Osagie, Mr. Kikumura states that the Correctional Officers called the infirmary on his behalf a second time at approximately 4:00 p.m., but Mr. Osagie ignored their call and left Mr. Kikumura in his cell. This allegation obviously contradicts Mr. Kikumura's deliberate indifference claim against the Correctional Officers, which states that they did not call the infirmary again until 7:35 p.m. Mr. Kikumura acknowledges this contradiction, but explains that he received inconsistent reports from prison officials about the timing of the second call to the infirmary, and therefore pled these two sets of facts in the alternative. Since the Federal Rules allow litigants to plead in the alternative, *see* Fed. R. Civ. P. 8(e)(2), Mr. Kikumura's inconsistent allegations regarding the second call to the infirmary do not undermine his Eighth Amendment claim against the Correctional Officers.

Third, the magistrate judge found that Mr. Kikumura's alleged "period of suffering due to conduct or inaction by Vail and Sanders lasted only two hours,"

-55-

and this short delay in treatment "cannot possibly constitute evidence of deliberate indifference." Mag. Rec. 26. Initially, we note that Mr. Kikumura asserts that the Correctional Officers knew he needed emergency medical treatment at approximately 4:00 p.m., but they waited until 7:35 p.m. before calling the infirmary: a delay of three and a half hours. In any event, we have held that "[e]ven a brief delay may be unconstitutional." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005). The alleged several-hour delay in Mr. Kikumura's emergency medical treatment was more than sufficient to meet this standard, at least for purposes of a motion to dismiss.

We therefore find that Mr. Kikumura has met the pleading requirements for his Eighth Amendment claim against Officers Vail and Sanders.

**3. Qualified Immunity**

When a defendant invokes qualified immunity, the plaintiff must demonstrate not only that the defendant's actions violated a specific constitutional right, but also that the constitutional right was "clearly established" at the time the actions took place. *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). In this case, however, no party argues that the "deliberate indifference" standard for claims of inadequate medical care under the Eighth Amendment was not clearly established. Those standards have been clearly established at least since *Estelle v. Gamble*, 429 U.S. 97 at 104, decided in 1976. The dispute in this case is not over the applicable constitutional standard, but over how it applies to these facts.

-56-

Since we conclude that the allegations in Mr. Kikumura's complaint are sufficient to state an Eighth Amendment claim against Mr. Osagie, Officer Vail, and Officer Sanders, we reverse the district court's finding that these defendants are entitled to qualified immunity.

**D. Failure to File a Certificate of Review**

Under Colorado law, litigants who bring a claim "based upon the alleged professional negligence of . . . a licensed processional" must "file with the court a certificate of review . . . within sixty days after the service of the complaint . . . unless the court determines that a longer period is necessary for good cause shown." Colo. Rev. Stat. § 13-20-602(1)(a). This certificate of review must declare that the plaintiff's attorney, or the plaintiff himself in a pro se action, *see Yadon v. Southward*, 64 P.3d 909, 912 (Colo. Ct. App. 2002), "has consulted a person who has expertise in the area of the alleged negligent conduct," and that "the professional who has been consulted . . . has concluded that the filing of the claim . . . does not lack substantial justification." § 13-20-602(3)(a). We have previously held that "Colorado's certificate of review requirement is a substantive rule of law," and is therefore "applicable to professional negligence claims brought against the United States under the FTCA." *Hill v. Smithkline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004). Since Mr. Osagie is a physician's assistant, and therefore a licensed professional, Mr. Kikumura is required to file a

certificate of review in support of his FTCA claims based on Mr. Osagie's alleged negligence.

Mr. Kikumura twice asked the magistrate judge to extend the deadline for filing a certificate of review and to appoint counsel to help him contact an expert, explaining that as an "incarcerated prisoner, [he has] no means to contact by himself . . . a doctor who could provide him with such a certification." Mot. for Extension of Time & Appointment of Counsel 2. He told the magistrate judge that he was trying "to obtain an attorney who could execute a 'certificate of review,'" but he had written to numerous law offices, which he listed, and each of them had either declined or not responded to his request for representation. *Id*. at 3.

Five months later, the magistrate judge issued an order recommending that Mr. Kikumura's entire action be dismissed and his outstanding motions be denied as moot. Noting that seven months had passed since the deadline for filing a certificate of review, the magistrate judge found that Mr. Kikumura had a "*de facto* 'extended period of time'" to meet the requirements of Colo. Rev. Stat. § 13-20-602, and that there was no point in granting a further extension. Mag. Rec. 36. The magistrate judge therefore recommended dismissing Mr. Kikumura's three FTCA claims based on Mr. Osagie's alleged malpractice (i.e., claims seven

through nine), along with his FTCA claim based on Mr. Osagie's outrageous conduct (i.e., claim eleven).[14]

In his objections to the magistrate judge's recommendation, Mr. Kikumura challenged the denial of his motion requesting appointment of counsel and an extension of time to file a certificate of review. He also filed a separate motion with the district court requesting appointment of counsel and an extension of time to file a certificate of review. In both filings, Mr. Kikumura argued that unless he was appointed counsel and allowed more time to file a certificate of review, Colo. Rev. Stat. § 13-20-602 would unconstitutionally hinder his access to the courts as a pro se litigant and prisoner. Obj. to Mag. Rec. 25; Mot. for Reconsideration 1.

The district court affirmed the magistrate judge's order denying Mr. Kikumura an extension of time and appointment of counsel, explaining that the magistrate judge's decision "is neither clearly erroneous nor contrary to law." Order 3. The court then addressed Mr. Kikumura's separate motion requesting appointment of counsel and an extension of time to file a certificate of review, which it treated "as a newly-filed motion before [it]" rather than as an objection to the magistrate judge's ruling. *Id*. The court "independently agree[d] with the magistrate judge that [Mr. Kikumura] ha[d] had ample time to submit such a Certificate." Order 4. Additionally, because "more than a dozen legal offices and

_____

[14]Mr. Kikumura does not challenge the decision to apply Colo. Rev. Stat. § 13-20-602 to his FTCA claim based on Mr. Osagie's "outrageous conduct."

law professors . . . declined his request" for legal assistance, the district court found that Mr. Kikumura's "claims have been reviewed on their merits by a number of attorneys and found to be without merit." *Id*. at 4. Finally, the court held that there was "no constitutional infirmity in the statute's application in this case" because it "applies to all litigants pro se or otherwise, whether a prisoner or not." *Id*. at 5.

On appeal, Mr. Kikumura argues that the district court abused its discretion by denying his requests for appointment of counsel and for an extension of time to file a certificate of review. Mr. Kikumura again states that he "has no choice but to ask the Court for an appointment of counsel who could execute the certificate of review" because "his diligent searching for a lawyer was in vain and he is indigent, having no fund[s] to hire an expert for a certification." Appellant's Br. P19-18, P19-20. Additionally, Mr. Kikumura complains that other than the "short list" of attorneys in the prison's legal office directory, "the prison provide[s] the prisoners no information" that would allow them to locate an independent medical expert, and thus he "is deprived of any meaningful means to access . . . the experts outside." *Id*. at P19-18–P19-19, P19-20. He also disputes the inference drawn by the district court that his failure to find an attorney implies that his claims lack merit. Mr. Kikumura attributes his inability to find a lawyer to the fact that he is "a prisoner," and this is a "pro bono case, and not a class action." *Id*. at P19-19. Finally, Mr. Kikumura argues that unless

he is appointed an attorney and allowed more time to file a certificate of review, applying Colo. Rev. Stat. § 13-20-602 to his case "would result in fundamental unfairness impinging on plaintiff's due process rights." *Id*. at P19-20 (citing *McCarthy v. Weinberg*, 753 F.2d 836, 838 (10th Cir. 1985)).[15]

We believe that Mr. Kikumura has raised a non-trivial constitutional challenge to the application of Colorado's certificate of review requirement as applied in this case. At the same time, however, the record below is insufficient for us to evaluate Mr. Kikumura's due process argument on appeal. There is no evidence regarding how a maximum security prisoner at ADX would go about obtaining the opinion of a medical expert on his case, how long this would take, or even whether it is feasible. The district court's observation that Colo. Rev. Stat. § 13-20-602 "applies to all litigants *pro se* or otherwise, whether a prisoner or not," Order 5, does not address the core of Mr. Kikumura's claim, which is that the certificate of review requirement "unconstitutionally hinder[s]" his "access to

_____

[15]The Defendants argue that Mr. Kikumura waived his due process argument by failing to raise it before the magistrate judge. The district court recognized that Mr. Kikumura's constitutional challenge to the certificate of review requirement appeared "[f]or the first time" in his objections to the magistrate judge's recommendations, and therefore did not address the due process issue in its de novo review of the magistrate judge's decision. Order 2, 3. Nonetheless, the district court considered (and denied) the due process objection on its merits in connection with what it called a "newly-filed motion before [the district court]" for appointment of counsel and an extension of time to file a certificate of review. Order 4–5. Consequently, the due process argument is properly presented to us on appeal.

the court[s]" and therefore violates his "due process rights." Appellant's Br. P19-18. As the Supreme Court explained in *Boddie v. Connecticut*, 401 U.S. 371 (1971), "a statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question." *Id.* at 379. On remand, the district court should conduct a more thorough inquiry into the factual and legal bases of Mr. Kikumura's due process challenge to Colo. Rev. Stat. § 13-20-602. It may also reconsider its denial of Mr. Kikumura's motion for an extension of time to file a certificate of review in light of the due process concerns implicated by such a denial.

## E. The Remaining FTCA Claims

### 1. Negligent Misrepresentation

When the Correctional Officers first took Mr. Kikumura to the infirmary, they were told by Mr. Osagie that he was malingering and there was "nothing wrong with [him]." Am. Compl. 19. Mr. Kikumura alleges that this was "negligent misrepresentation" actionable under the FTCA. *Id.* at 18–19. But the United States has not waived its sovereign immunity from "[a]ny claim arising out of . . . misrepresentation." 28 U.S.C. § 2680(h). Consequently, the district court lacked subject matter jurisdiction over Mr. Kikumura's negligent

misrepresentation claim against the United States, and we affirm the district court's order dismissing the claim.

## 2. Negligent Failure to Refer or Consult & Outrageous Conduct

Mr. Kikumura claims that soon after Officers Vail and Sanders took him from the infirmary back to his cell, they saw that he had "collapsed on the floor around [the] toilet, severely vomiting . . . [and] screaming 'help me' all hour." Am. Compl. 21. Mr. Kikumura alleges that, despite the "foreseeable . . . great risk of harm to [him]," Officers Vail and Sanders "negligently failed to refer or consult [his] emergency medical condition to . . . medical personnel who could treat [him] promptly until around [7:35 p.m.]." *Id*. His complaint asserts a right of recovery against the United States under the FTCA for the Correctional Officers' alleged "negligent failure to refer and consult," and their "outrageous conduct." *Id*. at 20–21.

Following the magistrate judge's recommendation, the district court dismissed both claims for lack of subject matter jurisdiction and failure to exhaust administrative remedies. It also dismissed the "negligent failure to refer and consult" claim on the ground this was not a cognizable cause of action under Colorado law, and therefore not subject to suit under the FTCA. We consider each point in turn.

The district court's jurisdictional ruling is slightly mysterious. It appears that the court based its ruling on our holding in *United States v. Agronics Inc.*,

164 F.3d 1343 (10th Cir. 1999), where we found that the Federal Mine Safety and Health Administration "cannot be held liable under the FTCA for adverse financial repercussions resulting from the determination of its own regulatory jurisdiction." *Id*. at 1347. The rationale for our holding in *Agronics* was that "the FTCA's waiver of sovereign immunity is limited to conduct for which a private person could be held liable under state tort law, and federal statutory duties regarding peculiarly administrative acts generally involve 'a type of conduct that private persons could not engage in, and hence could not be liable for under local law.'" *Id*. at 1346 (citations omitted) (quoting *Sea Air Shuttle*, 112 F.3d 532, 537 (1st Cir. 1997)). Applying *Agronics* to this case, the magistrate judge concluded that any "duty that the [Correctional] Officers might have toward plaintiff arises solely because of the relationship between correctional officers and plaintiff as a prisoner," and thus is "'a type of conduct that private persons could not engage in.'" Mag. Rec. 42, 43 (quoting *Agronics*, 164 F.3d at 1346). "In such circumstances," the magistrate judge found, "the United States may not be sued in tort under the FTCA." *Id*. at 43. The district court adopted this finding.

We agree with Mr. Kikumura that this ruling "is in error" because *Agronics* "is not applicable to [his] case." Appellant's Br. P19-21. Where prison officials ignore an inmate's cries for help, as Mr. Kikumura alleges, those prison officials are not engaging in the sort of "federal statutory duties regarding peculiarly administrative acts" that we were referring to in *Agronics*. Our holding in

*Agronics* is limited to government actors engaged in "'quasi-legislative' or 'quasi-judicial' action," *Agronics*, 164 F.3d at 1345 (internal quotation marks omitted), and thus has no bearing on Mr. Kikumura's FTCA claims based on the conduct of Officers Vail and Sanders. In fact, the district court's holding appears to be foreclosed by *United States* v. *Muniz*, 374 U.S. 150 (1963), where the Supreme Court held that actions filed "under the Federal Tort Claims Act to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee . . . are within the purview of the Act." *Id*. at 150.

The district court's second reason for dismissing the two claims – that Mr. Kikumura failed to exhaust his administrative remedies – is also incorrect. The court apparently based its decision on Mr. Kikumura's original administrative tort claim from September 2002, which failed to mention the possible wrongdoing of Officers Vail and Sanders. As the Defendants concede, however, Mr. Kikumura corrected this mistake three months later, when he filed a second administrative tort claim identifying Officer Vail and Officer Sanders as tortfeasors. The Defendants therefore do not defend this holding on appeal. Appellees' Br. 56 n.5. We commend the Defendants' candor, and agree that Mr. Kikumura's two FTCA claims based on the conduct of Officers Vail and Sanders cannot be dismissed for failure to exhaust administrative remedies.

The district court's final reason for dismissing Mr. Kikumura's "negligent failure to refer or consult" FTCA claim, which is not applicable to the "outrageous conduct" claim, is that Colorado does not recognize a tort of "failure to refer or consult." The government's consent to be sued under the FTCA extends only to claims arising out of "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The district court found that because Colorado does not recognize a general duty to "refer or consult" medical personnel whenever someone around you becomes ill, Mr. Kikumura's "negligent failure to refer or consult" claim is not cognizable under the FTCA.

As a general matter, the district court is correct that Colorado law imposes no duty "upon a person to take action for the protection of another even if it is reasonably apparent that such action is necessary to protect the other person from injury or peril." *Solano v. Goff*, 985 P.2d 53, 54 (Colo. Ct. App. 1999). But Colorado also recognizes exceptions to this rule. In determining whether the defendant owed a legal duty to help the plaintiff, Colorado courts look to the following five factors: "(1) the existence of a special relationship between the parties; (2) the foreseeability of harm to others; (3) the social utility of the defendant's conduct; (4) the magnitude of the burden of guarding against injury or harm; and (5) the practical consequences of placing a duty upon the

defendant." *Id.* "Other considerations may also be relevant," and "[n]o one factor is controlling" under this test. *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987). Ultimately, Colorado courts frame "the question of whether a duty should be imposed in a particular case [as] essentially one of fairness under contemporary standards — whether reasonable persons would recognize a duty and agree that it exists." *Id.*

Although Colorado courts have not yet addressed whether prison officials owe a duty of care to inmates regarding their medical needs, based on *Lannon*, we find that they would recognize a duty of care here. Applying the "fairness under contemporary standards" test to the facts as alleged by Mr. Kikumura — including his "obvious" need for assistance, cries for help, and complete dependency on the prison staff — we have no doubt that "reasonable persons" would have recognized a duty for Officers Vail and Sanders to call the prison infirmary on Mr. Kikumura's behalf. The five-factor test outlined in *Solano* reaches the same result. There is clearly a "special relationship" between Mr. Kikumura and the Correctional Officers, since, as a federal inmate, Mr. Kikumura is dependent upon and under the control of ADX prison and its staff. Moreover, based on the allegations in the complaint, the Correctional Officers' inaction posed an obvious risk of harm to Mr. Kikumura. We see very little "social utility" in allowing correctional officers to ignore an inmate's calls for help, and the burden of requiring them to call the prison infirmary is light. Finally, we note

-67-

that there appear to be few, if any, negative "practical consequences" from requiring prison guards to call the infirmary when inmates are in obvious need of emergency medical treatment.  Federal Regulations already require the Bureau of Prisons to "provide for the safekeeping, care, and subsistence of all persons" in their custody.  18 U.S.C. § 4042(a)(2).  Likewise, the Restatement (Second) of Torts § 314A (1965) imposes a duty on "[o]ne who is required by law to take . . . the custody of another under circumstances such as to deprive the other of his normal opportunities for protection," including the requirement "to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others."  Moreover, most states that have considered the issue have held that "a jailer incurs a duty to exercise reasonable care in protecting inmates' health and safety."  *Wallin v. Hill*, No. Civ. A.03 CV 280 WDMMJW, 2005 WL 1924663, at *10 (D. Colo. Aug. 10, 2005) (collecting the cases). Consequently, we find that Mr. Kikumura's "negligent failure to refer or consult" claim would be actionable under Colorado law, and is therefore cognizable under the FTCA.

Since Mr. Kikumura's FTCA claims based on the Correctional Officers' "negligent failure to refer or consult" and "outrageous conduct" are both properly exhausted and actionable under the FTCA, we reverse the district court's order dismissing these claims.

### 3. Respondeat Superior & Failure to Train and Supervise

The final cause of action asserted in Mr. Kikumura's complaint is an FTCA claim based on the Supervisory Defendants' "negligent . . . failure to provide adequate training and supervision to their staff." Am. Compl. 22. According to Mr. Kikumura, the Supervisory Defendants' negligence was the "actual and proximate cause" of his injuries. *Id*. Similar to the PLRA's exhaustion requirement, the FTCA "requires that claims for damages against the government be presented to the appropriate federal agency by filing . . . a written statement sufficiently describing the injury to enable the agency to begin its own investigation." *Bradley v. United States ex rel. Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991) (internal quotation marks omitted). Much like the administrative grievances submitted by Mr. Kikumura in connection with his *Bivens* claims, the administrative tort claims he filed with the BOP fail to mention the possibility that his injuries were caused by the inadequate training and supervision of ADX staff. For the same reasons that we found Mr. Kikumura failed to exhaust his *Bivens* claim against the Supervisory Defendants, we also find that he failed to exhaust his "respondeat superior and/or supervisory liability" FTCA claim.

Because we find that the district court properly dismissed both of Mr. Kikumura's claims based upon allegations of inadequate training and supervision of ADX staff, we also affirm the district court's order denying Mr. Kikumura's

motion for a temporary restraining order to enjoin BOP officials from destroying records relevant to those two claims.

## III. CONCLUSION

For the reasons stated above, we

(1) reverse the dismissal of the Eighth Amendment claims against Mr. Osagie;

(2) reverse the dismissal of the Eighth Amendment claim against Officers Vail and Sanders;

(3) affirm the dismissal of the Eighth Amendment claim against Captain Bauer, Captain Greenwood, Warden Pugh, and Assistant Warden Burrell;

(4) reverse the dismissal of the FTCA claims based upon Mr. Osagie's alleged professional negligence and outrageous conduct;

(5) affirm the dismissal of the FTCA claim based upon Mr. Osagie's alleged negligent misrepresentation;

(6) reverse the dismissal of the FTCA claims based upon Officers Vail and Sanders's alleged negligent failure to refer or consult and outrageous conduct;

(7) affirm the dismissal of the FTCA claim based upon Captain Bauer, Captain Greenwood, Warden Pugh, and Assistant Warden Burrell's alleged respondeat superior liability and negligent training and supervision; and

(8) affirm the denial of a temporary restraining order requiring retention of BOP records relating to training and supervision.

We remand the case to the district court for proceedings consistent with this opinion, including the reconsideration of Mr. Kikumura's motion for appointment of counsel and an extension of time to file a certificate of review. Appellant's motion to proceed in forma pauperis is granted. Appellant is reminded oh his obligation to continue to make partial payments until the entire fee is paid.